574 So.2d 197 (1991)
STATE of Florida, Appellant,
v.
Charles STEVENS, Appellee.
No. 89-2819.
District Court of Appeal of Florida, First District.
January 23, 1991.
*198 Robert A. Butterworth, Atty. Gen. and Carolyn J. Mosley, Asst. Atty. Gen., Tallahassee, for appellant.
Alvin L. Peters, of McCauley & Peters, Panama City, for appellee.
WIGGINTON, Judge.
The state brings this appeal from the trial court's order granting appellee Charles Stevens' motion to suppress statements he made to the police. The court expressly based its ruling on the United States Supreme Court's decision in Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). Implicated in the trial court's ruling are Stevens' rights under both the Fourth and the Fifth Amendments to the United States Constitution, made applicable to the states by the Fourteenth Amendment. Based on our review of the record and pertinent case law, we affirm in part, reverse in part, and remand for further proceedings.
Stevens was indicted for the first-degree murder and robbery of one Henry Pflegl in Bay County. Thereafter, he filed two motions to suppress his statements made to the police on the eighth and ninth of July 1988. A hearing was held on the motions on three consecutive days at which testimony was presented. However, the trial court did not finally rule on the motions until after trial had commenced and further testimony was presented. The court denied an additional motion to suppress physical evidence seized pursuant to a warrantless search of Stevens' sister's residence. However, it granted Stevens' motions to suppress his statements made by him on the eighth and ninth of July.[1]
The facts that were developed through the testimony of the witnesses during the suppression hearings and trial, and upon which the court relied are as follows.
On July 5, 1988, at approximately 5:00 p.m., one Mrs. Pflegl reported her son, Henry, missing. She also reported missing from the family's business a utility-type butcher knife. Based on the information received, Officer Quinn with the Panama City Police Department made out a missing person's report. Later that same day, Mrs. Pflegl called the police back and told them that some of the victim's friends had located his truck parked in front of a residence located at 2615 West Ninth Street. (The truck was later to be identified as parked in front of Stevens' sister's apartment.) When Officer Quinn arrived, he observed the friends by the truck. The truck was unlocked, the windows were down, and there was no key in the ignition. Officer Quinn inquired of nearby apartment residents as to the truck's owner, but received no significant information.
Officer Quinn left the scene but returned around 9:00 p.m. that evening pursuant to a call by one of the apartment residents that another resident had returned that evening who might have information as to the truck's owner. When Quinn arrived, he observed two males working underneath the hood of the truck who appeared to be *199 attempting to start the truck. Officer Quinn approached the two men and asked for the victim by name. A white male identified himself as Mike Kelly (later discovered to be Stevens), gave his date of birth and stated he lived in a green and white trailer on Michigan Avenue. He told Quinn that the truck had broken down, that Henry Pflegl had attempted to start it with a knife, and that Pflegl had just left with two females to obtain help. He further stated that Pflegl had been drinking and that he was probably going back to some of the west side bars.
Quinn inquired about the knife and "Kelly" retrieved a utility-type knife from underneath the truck and handed it to Quinn. Observing nothing unusual about the knife, Quinn placed it under the front seat of the vehicle where "Kelly" said Pflegl had retrieved it to start the vehicle.
Quinn also ran a registration check on the truck parked next to Pflegl's and found that it was registered to Robert Walker, the other male present at the truck (later discovered to be Stevens' sister's boyfriend). "Kelly" explained that he had called Walker to pick him up because he was under the belief that Pflegl would not be returning. Officer Quinn again left the scene and proceeded to investigate three bars on the west side of town unsuccessfully trying to locate Pflegl.
Three days later on July 8, 1988, the victim's body was found lying beside a highway. After viewing the body, Detective Dufresne with the Bay County Sheriff's Office returned to his office, and, after being informed of officer Quinn's report and with the assistance of Detective Winterman of the Panama City Police Department, located Robert Walker. Walker advised the detectives that Stevens had been with him the day they were found at the victim's truck and that he had given a false name to Officer Quinn. The detectives received Walker's consent to search his residence and were then directed by Walker to the apartment owned by Stevens' sister, Genine Taylor. In the meantime, two other detectives with the sheriff's office, Willoughby and Flowers, were ordered to make all efforts to attempt to locate Stevens. During their search conducted from information received by Walker, they were advised by a third party of Stevens' mother's place of employment. They contacted the mother, Sara Poche, who provided Detective Flowers with her address, but stated that she had not seen Stevens for two or three days. After speaking with her, the two detectives decided to check the residence to see if in fact, Stevens was there.
When Detectives Willoughby and Flowers arrived at the residence, at approximately 6:30 p.m. on July 8, the door was answered by Genine Taylor. The detectives identified themselves and Taylor allowed them to enter. Sitting in the living room was one James Gosnell.
Taylor denied knowing the whereabouts of Stevens and refused to grant the detectives permission to search the apartment without first obtaining permission from her mother. However, upon request by the detectives, Gosnell went to the back bedroom and told Stevens that some police officers wanted to talk to him. Stevens, who had allegedly been sleeping in the back bedroom, walked into the hallway and asked the police what they wanted. They told him they wanted to talk to him about his giving a false name to a police officer. Stevens responded that he did not want to go downtown and suggested that they talk to him in the house. Stevens later testified that he was given the impression that he had no choice but to accompany the detectives to the police station and was not permitted to retrieve a shirt and shoes from the back bedroom. Rather, according to Stevens, he was guided to the police car where he sat in the front seat on the passenger's side. To the contrary, according to the detectives, Stevens was informed that they needed him to come downtown because they were not the officers who desired to question him. It was their testimony that had Stevens refused to come with them to the sheriff's office, he would have been allowed to remain at the apartment and the case agent, Detective Winterman, would have been contacted. However, it is undisputed that neither Willoughby nor Flowers formally arrested Stevens.
*200 When they arrived at the sheriff's office, Stevens was taken to an office in the back and remained there with Willoughby and Flowers approximately 15 minutes until Detectives Winterman and Dufresne arrived at 7:00 p.m. Willoughby and Flowers did not "Mirandize" Stevens, but neither did they interrogate him. According to Willoughby and Flowers, Stevens from the onset stated that he did not mind talking and did not request an attorney.
While in the presence of Willoughby and Flowers, Stevens allegedly spontaneously and voluntarily stated that the only reason he could think of as to why the police wanted to talk to him was because of "that guy's truck" he was trying to start when the police officer came by. He explained that some guy in a large car picked him up and dropped him off at his mother's residence, and the next day returned with two girls and asked Stevens to help him get his car started. This person took Stevens to the truck, following which Stevens and a friend were in the process of trying to get the truck started when the police officer arrived.
When Winterman and Dufresne arrived, Dufresne advised Stevens of his Miranda rights. Stevens said he understood his rights and wanted to talk to them. According to these detectives, Stevens never asked to speak to an attorney and was calm and cooperative. Dufresne interviewed Stevens approximately four to five minutes when he was summoned out of the room by his superior for a short period of time.
During the interview, Stevens made the following statement: A white male picked him up hitchhiking on the Hathaway Bridge and took him to his mother's address. This man returned the next day in a large brown vehicle with two females and requested his help in starting the truck. They traveled to Ninth Street and Drake Avenue where the truck was located. Not too long thereafter the man and the two females left to go to a party and Officer Quinn showed up. After Officer Quinn arrived, a man named Bobby came up, but he did not know this man's last name or anything about him.
Winterman informed Stevens that he was lying because another subject in custody had told him a different story. Stevens allegedly became irate and told Winterman he did not want to talk to him anymore. Dufresne and Winterman left the room.
On the other hand, Stevens testified that Winterman told him he was not going home. Stevens then got up from his seat and laid down on the floor, shutting his eyes to apparently convey the message that he intended to say nothing further. The officers walked out and Stevens laid there on the floor for quite a while. Winterman and Dufresne did not recall that conversation.
The next detective to interrogate Stevens was Detective Woodall with the Panama City Police Department. Woodall was specifically contacted and asked to come down to the station since he had known Stevens' family for about eight years and had arrested Stevens on numerous prior occasions.
Before interviewing Stevens, Woodall spoke to Winterman who told him Stevens had been Mirandized. Winterman and Dufresne thereafter did not return to interview Stevens that day but instead interviewed Walker and Genine Taylor.
Detective Woodall first interrogated Stevens between 7:40 p.m. and 9:40 p.m. Woodall did not re-Mirandize Stevens when he first entered the room but told Stevens he was there to find the truth and Stevens never requested an attorney. Woodall did not recall for certain but he thought he might have intimated that Bobby Walker was blaming Stevens for the entire matter. At first, Stevens denied any involvement in the murder but later in the interview admitted to being scared and kept saying that they were talking about his life. He expressed the desire for some time to think. After he stated a couple of times that he wanted to talk but was scared and needed some time to think, Woodall left him alone at approximately 9:10 p.m. Stevens contradicted this testimony, maintaining that he told Woodall he was not talking to anyone.
After Woodall completed his first interview with Stevens, he spoke to Officer Winterman, *201 telling him that he thought Stevens knew something about the murder, although he did not go into it at that point. Woodall also informed Detective Dufresne at some point that Stevens wanted to be taken to a cell to think things over. Thereafter, Woodall left the sheriff's office and proceeded to a lounge managed by Stevens' mother, Sara Poche, where he told her that Stevens was at the sheriff's department and was believed involved in a killing. Poche recalled that Stevens had been in the bar earlier that week telling an older man something about "drop-kicking a faggot." At that time, she criticized him for making the comment and Stevens made some comment in return to the effect that she would believe anything he said. Poche agreed to accompany Woodall to the sheriff's office to take her statement. They arrived around 11:20 p.m. and her statement was taken shortly thereafter. She recounted essentially what she had heard at the bar and added something that Stevens had said to his sister. She also recalled hearing something about a killing and that is when Stevens began talking about "drop-kicking" some guy.
In the meantime, Detectives Winterman and Dufresne reinterviewed Robert Walker and received a taped statement from him. They also interviewed Genine Taylor at approximately 11:56 p.m. In her statement, Taylor advised the detectives that before noon on July 5, 1988, her mother returned home extremely upset and told Taylor that Stevens had just told her that he "had hurt somebody real bad." Taylor accompanied her mother to the lounge and called Stevens outside, inquiring as to what had happened in her (Taylor's) apartment. Stevens allegedly replied that a man came up the stairs with a knife and he kicked the knife out of the man's hand, and that the man had fallen down the stairs. Later that evening, Taylor, Stevens, and Walker went to the place where the truck was parked next door to Taylor's apartment. Stevens told Walker that he bought the truck and needed assistance in getting it started. Taylor vaguely remembered the police coming up and talking to Walker and Stevens while they were there trying to start the truck. At 12:08 a.m., Taylor consented in writing to a search of her apartment. Detective Winterman left to conduct the search at 12:30 and returned at approximately 4:00 a.m. and booked Stevens.
In the meantime, when Detective Woodall received Sara Poche's statement, he returned to Stevens informing him of what his mother had said and indicated to Stevens that "the game was basically up." According to Woodall, Stevens did not believe him but stated that if his mother could come in he would talk to Woodall. When Stevens' mother arrived in the room, Woodall advised Stevens of his Miranda rights. A taped interview thereafter began at approximately 12:47 a.m. on July 9. The statement was clearly inculpatory, revealing that Stevens had indeed killed Henry Pflegl.
At this point it should be emphasized that none of the detectives were of the opinion that they had had probable cause to initially arrest Stevens before bringing him to the sheriff's office. Based on the foregoing testimony, the trial court granted Stevens' motion to suppress his statements given earlier on July 8 and then ultimately on July 9, relying on that portion of the U.S. Supreme Court's decision in Dunaway v. New York, specifically holding that detention for custodial interrogation "regardless of its label intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." (See Record Transcript, Vol. I, p. 55.) At a subsequent hearing, the trial court opined that not even reasonable people could differ that at some point between the time claimant was initially picked up by the police and the time after midnight on July 9 when he gave his confession that claimant was under arrest. The court reiterated its position that the Dunaway v. New York decision prompted it to rule as it did.
On appeal, the state submits that implicit in the trial court's reliance on the language in Dunaway are four findings of fact. First, the state maintains the court implicitly found that Stevens' statements were voluntarily made, insofar as in Dunaway, the *202 Supreme Court observed that satisfying the Fifth Amendment is a threshold condition of the Fourth Amendment analysis. 442 U.S. at 219, 99 S.Ct. at 2260, 60 L.Ed.2d at 839. The other three implicit findings were that Stevens was involuntarily seized and detained for interrogation, which seizure and detention was tantamount to an arrest; the police lacked probable cause to arrest Stevens; and there was no break in the causal connection between Stevens' illegal arrest and the statement subsequently made.
The state concedes that there is ample testimony in the record to support the court's implicit finding that Stevens was involuntarily seized and detained at some point before he confessed. However, the state strongly submits that the court's implicit finding that the police lacked probable cause to arrest is not supported by the record. It is the state's position that based on the collective knowledge and the information of all the officers involved in the investigation, Justus v. State, 438 So.2d 358, 363 (Fla. 1983), cert. denied, 465 U.S. 1052, 104 S.Ct. 1332, 79 L.Ed.2d 726 (1984), the police had probable cause to arrest Stevens at least for a misdemeanor committed in the presence of Officer Quinn (false identity), but also that they had probable cause to arrest Stevens for felony grand theft and possibly even murder. The state urges it is of no consequence that the detectives did not realize the facts constituted probable cause to arrest Stevens on a felony charge, as the probable cause test is an objective one. Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); Routly v. State, 440 So.2d 1257 (Fla. 1983).
To the contrary, Stevens contends that viewing the evidence in the light most favorable to him, and resolving all doubts and conflict in his favor, State v. Williams, 371 So.2d 1074 (Fla. 3d DCA 1979), at the time of his "arrest" shortly before 7:00 p.m. on July 8, the officers knew only that Stevens had been in the vicinity of the decedent's truck with another person and that he had given a false name. Such evidence was clearly insufficient on which to base a finding of probable cause to arrest him on felony charges, and Stevens points out that although the officers' characterization as to the existence of probable cause is not controlling, their opinion that no probable cause existed well into the evening of July 8 surely constituted substantial competent evidence upon which the court was entitled to rely.
Stevens goes on to argue that although the state relies in the alternative on an asserted misdemeanor theory, Stevens' warrantless arrest three days after his confrontation with Officer Quinn by entirely different officers lacks support in the law. Specifically, Stevens points out that the arresting officer must have perceived all elements of the misdemeanor in order to legitimate a warrantless misdemeanor arrest. Towne v. State, 495 So.2d 895, 898 (Fla. 1st DCA 1986). Moreover, Section 901.15, Florida Statutes, requires such a misdemeanor arrest to occur "immediately or in fresh pursuit." Boca Raton v. Coughlin, 299 So.2d 105 (Fla. 4th DCA 1974).
We agree with Stevens that there was no probable cause for the arrest. Even if one were to consider all of the information known collectively by the sheriff's office and the Panama City Police Department at the time Detectives Willoughby and Flowers brought Stevens in for questioning, it would not have justified a belief that Stevens committed the felony of grand theft or, possibly, murder. At most, and as admitted by the officers who testified, only a reasonable suspicion that Stevens had engaged in criminal activity was present. Cf. State v. Rogers, 427 So.2d 286 (Fla. 1st DCA 1983). Nor is this a case where Stevens was properly arrested for the commission of a misdemeanor since Officer Quinn did not observe a misdemeanor taking place in his presence or on fresh pursuit.
The state correctly points out that the police officers' belief that they did not detain Stevens on probable cause is not controlling. However, it is obvious from the Supreme Court's opinion in Dunaway that the motivation for the detention is highly persuasive in determining the illegality *203 of the detention. Here, it is clear that the officers' intent was strictly to pick Stevens up for investigatory purposes. It is obvious that the officers did not initially possess such an abundance of incriminating information as was involved in Justus v. State. In that regard, the police contact herein was indistinguishable from that involved in Dunaway and in Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). As was observed in Brown, "[t]he detectives embarked upon this expedition for evidence in the hope that something might turn up." 422 U.S. at 605, 95 S.Ct. at 2262. Accordingly, we hold that the police in the instant case violated the Fourth and Fourteenth Amendments when, without probable cause, they seized Stevens and transported him to the sheriff's office for interrogation.
Nevertheless, despite our holding that Stevens' "arrest" was illegal, we conclude that his statement made on July 9 need not have been suppressed on that ground. In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court ruled:
We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."
[citation omitted] Id., 371 U.S. at 487-88, 83 S.Ct. at 417. As recognized by the Court in Dunaway, the Court in Brown identified the relevant inquiry under Wong Sun as whether the statements were obtained by exploitation of the illegality of the defendant's arrest. Brown v. Illinois, 422 U.S. at 600, 95 S.Ct. at 2260. Brown went on to observe that
[t]he question whether a confession is the product of a free will under Wong Sun must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant... . And the burden of showing admissibility rests, of course, on the prosecution.
Id., at 603-604, 95 S.Ct. at 2261-62.
Although the trial court failed to undertake the inquiry mandated by Wong Sun to evaluate the circumstances of this case, the record is sufficiently detailed from which the determination may be made. Applying the above factors set forth in Brown to the instant case, we conclude that the prosecution carried its burden of showing admissibility. First, regarding the temporal proximity of the arrest and Stevens' confession, we find that the approximately five hours between the illegal arrest and the confession alone failed to purge the initial taint. Cf. Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). While in Brown and Dunaway the incriminating statements were obtained within two hours, the lengthier detention in the instant case is minimal in distinction and not determinative under the circumstances as a whole. As was true in Taylor, the time factor here is relatively insignificant where Stevens was in continuous police custody, unrepresented by counsel, and underwent considerable interrogation. Indeed, it has been held that this factor of temporal proximity is "scarcely outcome determinative." State v. Reffitt, 145 Ariz. 452, 702 P.2d 681, 688 (1985).
Thus, we turn next to the factor considering the purpose and flagrancy of the official misconduct. Again, we must conclude that the police conduct in this case in *204 detaining Stevens for obviously investigatory purposes was as condemnatory as it was in Brown and Dunaway, and failed to mitigate the taint of the illegal arrest.
Rather, the most relevant factor for purposes of the instant inquiry regards the presence of intervening circumstances. Once more, "it must be emphasized that the Constitution does not require a person illegally detained be forever granted immunity from prosecution or conviction." People v. Rogers, 52 N.Y.2d 527, 439 N.Y.S.2d 96, 98, 421 N.E.2d 491, 492 (1981), cert. denied, 454 U.S. 898, 102 S.Ct. 399, 70 L.Ed.2d 214 (1981), citing United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980). In that regard, as already noted, when the connection between the discovery of the challenged evidence and the illegal activity is sufficiently attenuated by a significant intervening event, a justifiable conclusion is that the evidence is not the product of the illegal activity. Wong Sun v. United States.
In the instant case, there is ample support for the conclusion that the evidence in the hands of the police just prior to Stevens' confession, and with which he was confronted, was not discovered as the result of his illegal detention but rather as a result of an independent, parallel investigation. Nothing gained from Stevens' detention provided the police with information leading to that evidence which would connect the evidence to the detention. Certainly, by the time Detective Woodall interviewed Stevens' mother and obtained her statement, the information collectively known by the police, including the information gleaned from the evidence obtained from Robert Walker and Genine Taylor, would have justified a trial court's concluding that the police had probable cause to arrest Stevens just prior to his confession. Cf. Justus v. State, 438 So.2d at 363; see also United States v. Agostino, 608 F.2d 1035, 1037 (5th Cir.1979). An additional consideration, though alone not dispositive, was the fact of Stevens' voluntary seclusion for approximately two hours just prior to his confession. Further, and most significant here, is the intervening circumstance of Stevens' being confronted with untainted evidence which produced his desire to confess. See In the Interest of R.S., 93 Ill. App.3d 941, 49 Ill.Dec. 551, 418 N.E.2d 195 (1981). Stevens confessed shortly after being informed of his mother's statement to Detective Woodall. Thus, even if the initial arrest had been illegal for lack of probable cause, the incriminating statement later made by Stevens on July 9 certainly was not obtained by exploitation of the illegal arrest. Consequently, it need not have been suppressed. Compare People v. Finch, 86 Ill. App.3d 493, 41 Ill.Dec. 741, 408 N.E.2d 87 (1980); Barry v. New Jersey, 86 N.J. 80, 429 A.2d 581 (1981), cert. denied, 454 U.S. 1017, 102 S.Ct. 553, 70 L.Ed.2d 415 (1981) (supreme court denied certiorari, with three justices dissenting in a case holding that probable cause is an intervening factor)[2]; People v. Rogers, 52 N.Y.2d 527, 439 N.Y.S.2d 96, 421 N.E.2d 491 (1981); Commonwealth v. Bogan, 482 Pa. 151, 393 A.2d 424 (1978); Townsley v. State, 652 S.W.2d 791 (Tex.Cr.App. 1983).
However, this by no means ends the inquiry as to the admissibility of appellant's July 9 confession as it pertains to the Fifth Amendment. In Dunaway v. New York, the Supreme Court held that
although a confession after proper Miranda warnings may be found "voluntary" for purposes of the Fifth Amendment, this type of "voluntariness" is merely a "threshold requirement" for Fourth Amendment analysis... . Indeed, if the Fifth Amendment has been *205 violated, the Fourth Amendment issue would not have to be reached.
442 U.S. 200, at 217, 99 S.Ct. 2248, at 2259.
The state seizes on the above-quoted language in Dunaway to argue that this court may imply that the trial court, by reaching the Fourth Amendment question, implicitly ruled that the Fifth Amendment had been satisfied. However, we cannot make this assumption on the instant record. Rather, it is clear from the record that the court did not make the threshold inquiry as to voluntariness and we hold that that inquiry is necessary in order to rule the July 9 confession admissible, despite our holding that the Fourth Amendment was not violated.
Consequently, we affirm the order suppressing the statement given on July 8, but reverse the order of the trial court insofar as it suppressed the statement made by Stevens on July 9 on Fourth Amendment grounds. Nonetheless, the cause is remanded for the trial court to consider whether that latter statement was voluntarily given in compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and without the coercion and the compulsion inherent in custodial surroundings.
AFFIRMED, in part, REVERSED, in part, and REMANDED for further proceedings.
MINER and WOLF, JJ., concur.
NOTES
[1] After the court ruled on the suppression motions, defense counsel moved for a mistrial which the court granted. The trial court reduced to writing its verbal order relating to the suppression motions and the next day, the state filed its notice of appeal. In this court, Stevens filed a motion to dismiss the appeal on the basis that it was not from a pre-trial order granting motions to suppress. In a written opinion filed June 21, 1990, this court denied the motion to dismiss finding by virtue of the mistrial that the order is, in effect, a pre-trial order for purposes of the rule under the rationale of Savoie v. State, 422 So.2d 308 (Fla. 1982). See State v. Stevens, 563 So.2d 188 (Fla. 1st DCA 1990).
[2] We are not hereby holding, as would appear to be the question that troubled the three Supreme Court dissenters in Barry v. New Jersey, that in any case where probable cause is fortuitously developed after the illegal arrest but prior to the accused's confession, the Fourth Amendment has been satisfied. We do not intend by our holding to invite law enforcement officers to pick up suspects for questioning in order that they may have the suspect safely tucked away in detention while they conduct a further investigation. Rather based on the totality of the circumstances in the instant case preceding Stevens' confession, we are merely holding that the confession was not obtained by an exploitation of his illegal detention.