**Abelino MONGE, Appellant**

v.

**The STATE of Texas, Appellee.**

**No. 14–07–00468–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Jan. 13, 2009.

George McCall Secrest, Jr., Brian Benken, Houston, TX, for appellants.

Dan McCrory, Houston, TX, for the State.

Panel consists of Justices ANDERSON and FROST, and Senior Justice HUDSON.*

## OPINION

J. HARVEY HUDSON, Senior Justice.

Following a plea of guilty, appellant, Abelino Monge, was convicted of capital murder and was incarcerated to serve a life sentence. In one issue, appellant challenges the trial court's denial of his motion to suppress his recorded confession. He contends he was unlawfully arrested, his subsequent confession was tainted under the "fruit of the poisonous tree" doctrine, and the State did not prove attenuation of the taint. We affirm.

## BACKGROUND

On July 12, 2005, Detective Mark Reynolds arrived at a murder scene in which the victim had been shot twice in the back. Although the initial investigation did not produce any suspects, Reynolds later found, in the victim's back yard, a cell phone that had been issued to appellant. Reynolds obtained the phone records and learned that, on the day of the murder, the cell phone had been used to place calls to, and receive calls from, the victim. The phone records also listed calls between appellant, the victim, and a third individual, Margil Ochoa.

Reynolds drove to appellant's workplace on the morning of July 21, 2005, to question appellant about the cell phone. Appellant responded that his cell phone had been stolen, but he voluntarily accompanied Reynolds to the sheriff's department for further questioning. Upon arrival, appellant was placed in a small windowless room, where he was briefly questioned. Appellant denied any involvement in the murder. He voluntarily provided a DNA saliva sample, consented to a search of his vehicle and residence, and submitted to a polygraph examination that ended at approximately 6:00 p.m. Having been told he was free to leave, appellant instead fell asleep on the floor of the room where he had been interviewed.[1] There would be no further contact between appellant and the law-enforcement officers until the following morning.

Meanwhile, in a different interview room, the detectives were separately questioning Margil Ochoa, who appeared to be

---

* Senior Justice J. Harvey Hudson sitting by assignment.

1. Both parties agree that appellant was free to leave until at least midnight on July 22, six

hours after the polygraph examination concluded.

more forthcoming with information than appellant had been. At approximately midnight on July 22, Ochoa admitted his and appellant's involvement in the murder, specifically identifying appellant as the "shooter." After several more hours of questioning, Ochoa signed a written confession that again implicated him and appellant in the murder. At no time did the deputies procure an arrest warrant for appellant.

At approximately 7:00 a.m., the district attorney agreed to accept capital murder charges against appellant and Ochoa. Reynolds informed appellant he was under arrest, and placed him in handcuffs. While Reynolds was processing the paperwork, a second set of detectives decided to question appellant again. Appellant was given *Miranda* warnings. He was then advised that Ochoa was also under arrest, and that Ochoa had implicated appellant in the crime. Specifically, one of the detectives told appellant:

I was here late last night too whenever all this was going on and I went and picked up Ochoa and he's trying to help hi[m]self. You know what I'm saying?
. . .
. . . .
I'm going to tell you up front . . . that *your fall partner has given you up.*[2] He's given every detail about what took place from the time you guys left climbing over the fence, just about knocking him over, going down, sliding down the bayou, swimming in the bayou. . . . You know, they, they know everything at this point and all it is, to getting you convicted. . . . And you know here you have, uh one, one guy that's trying to help hi[m]self, he's concerned about his family, he doesn't wanna spend the rest of his life in jail, you know he's honestly

trying to help hi[m]self. You know he's admitting that, you know, this just wasn't supposed to happen like this. . . . You know what I mean? We have his story.
. . . .
But I can tell you . . . everything that he's said is collaborated [sic] by the dead guy['']s girlfriend, so we know that he's telling the truth from that point on.

After learning that Ochoa had implicated him, appellant confessed to shooting the victim twice. The interview, including appellant's confession, was recorded and videotaped.

Appellant was indicted for capital murder. Before trial, appellant moved to suppress his confession, contending it was tainted by a warrantless, unlawful arrest. Appellant did not testify at the suppression hearing, which spanned several days. The trial court, which ultimately denied the suppression motion, found that appellant was free to leave the sheriff's department at all times until he was actually placed in custody at 4:00 a.m. on July 22. The court further concluded that the detectives improperly failed to procure an arrest warrant, and that the warrantless arrest was not excused by article 14.04 of the Code of Criminal Procedure. However, the court determined that the taint of the warrantless arrest was attenuated.

Appellant indicated his intent to appeal the trial court's ruling, and then pled guilty to the charged offense. The court sentenced appellant to confinement for life in the Texas Department of Criminal Justice. This appeal ensued. In one point of error, appellant contends the trial court abused its discretion by denying his motion to suppress because the State failed to prove attenuation of the taint of his unlawful arrest.

---

**2.** Emphasis added.

## STANDARD OF REVIEW

We employ a bifurcated standard of review to consider a trial court's ruling on a motion to suppress evidence. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim. App.2000); *Turner v. State*, 252 S.W.3d 571, 576 (Tex.App.-Houston [14th Dist.] 2008, pet. ref'd). We will defer almost entirely to the trial court's findings of historical fact that are supported by the record, especially when the findings relate to an evaluation of credibility and demeanor. *See Turner*, 252 S.W.3d at 576 (citing *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim. App.1997)). We afford the same level of deference to rulings on mixed questions of law and fact when the resolution of those issues turns upon an evaluation of credibility and demeanor. *See State v. Ross*, 32 S.W.3d 853, 856 (Tex.Crim.App.2000); *Guzman*, 955 S.W.2d at 89. By contrast, we review *de novo* the issues that do not depend upon credibility and demeanor. *See Turner*, 252 S.W.3d at 576.

The trial court is the sole fact-finder at a suppression hearing and may freely believe or disbelieve all or part of the evidence presented. *See Ross*, 32 S.W.3d at 855; *Weems v. State*, 167 S.W.3d 350, 354–55 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd). Therefore, we review the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex.Crim.App.2006); *Rothstein v. State*, 267 S.W.3d 366, 371 (Tex.App.-Houston [14th Dist.] 2008, no pet.). We will sustain the trial court's ruling if it is reasonably supported by the record and is correct under any applicable legal theory. *See Ross*, 32 S.W.3d at 855–56.

## ANALYSIS

The "fruit of the poisonous tree" doctrine generally precludes the use of evidence, both direct and indirect, obtained following an illegal arrest. *See Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Iduarte*, 268 S.W.3d 544, 550 (Tex.Crim. App.2008). Here, the State does not challenge the illegality of appellant's warrantless arrest, which did not fit within any of the recognized exceptions to the warrant requirement. Instead, the State contends the nexus between the unlawful arrest and appellant's confession was so attenuated as to dissipate the taint of the prior illegality. *See Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. 407. After reviewing the record, we agree.

Evidence that is sufficiently attenuated from the unlawful arrest is not considered to have been obtained therefrom. *See Sims v. State*, 84 S.W.3d 805, 810 (Tex.App.-Houston [1st Dist.] 2002, no pet.). The prosecution carries the burden of proving attenuation. *See Brown v. Illinois*, 422 U.S. 590, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Garcia v. State*, 3 S.W.3d 227, 242 (Tex.App.-Houston [14th Dist.] 1999), *aff'd*, 43 S.W.3d 527 (Tex. Crim.App.2001). In deciding whether appellant's confession, which was given following an illegal arrest, was sufficiently attenuated as to permit the use of the confession at trial, we are to consider the following factors:

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and

(4) the purpose and flagrancy of the official misconduct.

*See Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254; *Bell v. State*, 724 S.W.2d 780, 788 (Tex.Crim.App.1986); *Weems*, 167 S.W.3d at 359. These four factors do not necessarily carry equal weight. *See Bell*, 724

S.W.2d at 788–90 (generally describing the relative importance of each factor); *Self v. State,* 709 S.W.2d 662, 668 (Tex.Crim.App. 1986). We will apply each of these factors, in turn, to the evidence adduced at the suppression hearing.

### A. Whether Miranda Warnings were Given

■■■ The giving of *Miranda* warnings, standing alone, does not sufficiently attenuate the taint of an arrest in violation of the Fourth Amendment. *See Brown,* 422 U.S. at 603, 95 S.Ct. 2254. As the Court of Criminal Appeals observed, "the right to be free from warrantless arrest is at least equal in magnitude to the state and federal constitutional right to be free from unreasonable searches and seizures. . . . [T]he State cannot violate the Fourth Amendment with impunity by washing its hands in the procedural waters of the Fifth Amendment[.]" *Bell,* 724 S.W.2d at 787. However, *Miranda* warnings, while not the only consideration, remain an important factor in determining whether a confession was obtained through exploitation of an illegal arrest. *See Brown,* 422 U.S. at 603, 95 S.Ct. 2254; *Little v. State,* 758 S.W.2d 551, 566 (Tex.Crim.App.1988); *Self,* 709 S.W.2d at 666.

At the beginning of the recorded interview, appellant was given *Miranda* warnings. Appellant acknowledged that he understood those rights, and he implicitly waived those rights by proceeding to answer the detectives' questions. *See Turner,* 252 S.W.3d at 583–84; *State v. Oliver,* 29 S.W.3d 190, 193 (Tex.App.-San Antonio 2000, pet. ref'd). Appellant notes that, unlike several other attenuation cases, he received only one *Miranda* admonition. *See Little,* 758 S.W.2d at 566 (three *Miranda* warnings); *Bell,* 724 S.W.2d at 785–86 (at least four warnings); *Self,* 709 S.W.2d at 666 (three warnings); *Weems,* 167 S.W.3d at 359 (at least three warn-

ings). However, we do not perceive these authorities as holding that the first factor of *Brown v. Illinois* requires multiple *Miranda* warnings. The fact that repeated warnings may have been *sufficient* in other cases does not necessarily mean, in the context of this attenuation analysis, that multiple warnings are *mandatory.* *See Bell,* 724 S.W.2d at 788 (asking simply whether *Miranda* warnings were given); *see also Rosalez v. State,* 875 S.W.2d 705, 722 (Tex.App.-Dallas 1993, pet. ref'd) (resolving first factor in State's favor because defendant received *Miranda* warnings immediately after arrest, and indicated he understood his rights).

This first factor weighs in the State's favor.

### B. Temporal Proximity between Arrest and Confession

■■■ Next, we analyze the temporal proximity between the arrest and the confession. This factor, which has been described as "ambiguous," is given the least weight among the four *Brown v. Illinois* considerations. *See Weems,* 167 S.W.3d at 359; *Darden v. State,* 783 S.W.2d 239, 243 (Tex.App.-Corpus Christi 1989, pet. ref'd). Generally, longer time periods tend to favor a finding of attenuation. *See Townsley v. State,* 652 S.W.2d 791, 797 (Tex.Crim. App.1983). By contrast, when the time between the arrest and confession is short, it may be inferred that the defendant was not given time to reflect upon his situation following his arrest. *See Weems,* 167 S.W.3d at 359; *see also Juarez v. State,* 758 S.W.2d 772, 781 (Tex.Crim.App.1988), *overruled on other grounds by Boyle v. State,* 820 S.W.2d 122 (Tex.Crim.App.1989) ("[T]he shorter the time, the more likely it is that the taint of the illegal arrest or stop has not been purged.").

Here, the trial court found that appellant was in custody as of 4:00 a.m. on July

22 but that he was not informed of his arrest until 6:30 a.m., roughly two-and-one-quarter hours prior to the interview that produced his recorded confession.[3] Courts that have considered similar time frames consistently have resolved this factor in the accused's favor. *See Bell,* 724 S.W.2d at 788 (one-and-a-half to three hours); *Self,* 709 S.W.2d at 666 (two hours); *Weems,* 167 S.W.3d at 360 (two to two-and-a-half hours).

Although the "time proximity" element is "generally not a strong determining factor per se," this second factor tends to favor appellant, against admission of the confession. *See Bell,* 724 S.W.2d at 788–89. However, because each factor need not be resolved in the State's favor before a confession may be admitted, we must consider the third and fourth *Brown* factors. *See Juarez,* 758 S.W.2d at 780.

## C. Presence of Intervening Circumstances

■■ Generally, a confession obtained through interrogation following an illegal arrest should be excluded unless subsequent "intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint." *Townsley,* 652 S.W.2d at 796–97 (citing *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982)). Similarly, intervening events that flow from the illegal arrest usually do not, by themselves, attenuate the taint. *Bell,* 724 S.W.2d at 789.

The United States Supreme Court has not defined what constitutes an "intervening event" that sufficiently purges the taint of an illegal arrest. The Texas Court of Criminal Appeals has identified some significant intervening events as including the accused's appearance before a magistrate, termination of the illegal custody, consultation with counsel, or a volunteered statement that was not made in response to police interrogation. *See id.* at 789 n. 5. Here, the trial court found, and the State acknowledges, that none of these specifically-enumerated events intervened to dissipate the taint of appellant's warrantless arrest.

However, several jurisdictions have repeatedly held that confrontation of the accused with *untainted* information of his guilt—such as the confession of an accomplice—may qualify as an intervening circumstance, if the untainted evidence was acquired apart from the illegal arrest. *See State v. Brunetti,* 279 Conn. 39, 901 A.2d 1, 25 (2006) (concluding defendant's confession was prompted not by unlawful detention but by lawful discovery of untainted, incriminating evidence); *State v. Tobias,* 196 Wis.2d 537, 538 N.W.2d 843, 847–48 (Ct.App.1995) (same); *Thorson v. State,* 653 So.2d 876, 886 (Miss.1994) (same); *People v. Gabbard,* 78 Ill.2d 88, 34 Ill.Dec. 751, 398 N.E.2d 574, 579 (1979) (same); *Allen v. Cupp,* 426 F.2d 756, 759 (9th Cir.1970) ("We conclude . . . that the confession was not the product of the illegal arrest and custody, but the product of appellee's own decision to confess after his companion had done likewise."). In adopting this rule, the Wisconsin Supreme Court concluded:

---

**3.** Appellant argues that, although he was considered to be in custody at 4:00 a.m., we should analyze the "time proximity" factor beginning at 6:30 a.m., at which time appellant first became aware that he had been arrested. We agree. This factor focuses on the defendant's ability to reflect upon his situation, and the consequences of confession, after his arrest. *See Darden,* 783 S.W.2d at 243. Because appellant was not aware that he had been arrested until 6:30 a.m., it follows that his period of self-reflection would not begin until then, either. *See id.*

[T]estimony indicates that the confrontation with this untainted evidence was the intervening circumstance that induced Tobias to confess. Several jurisdictions have held confrontations may constitute intervening circumstances under the *Brown* analysis. " 'A defendant's confrontation with untainted evidence, which induces in the defendant a voluntary desire to confess, may be a legitimate intervening circumstance' to dissipate the taint of the defendant's earlier illegal arrest."

. . . .

. . . This possibility was contemplated by the United States Supreme Court in *Brown*, where it observed that it is entirely possible that persons arrested illegally frequently may decide to confess, as an act of free will unaffected by the initial illegality. Because Tobias's incriminating statements were an act of free will induced not by the illegal arrest but by the confrontation with untainted evidence, we conclude this *Brown* factor weighs in favor of attenuation.

*Tobias*, 538 N.W.2d at 847–48 (citations omitted).

In 1984, the Texas Court of Criminal Appeals was presented with a similar situation but declined to find attenuation. *See Gregg v. State*, 667 S.W.2d 125 (Tex.Crim. App.1984), *overruled on other grounds by Russell v. State*, 717 S.W.2d 7 (Tex.Crim. App.1986). However, we believe *Gregg* is factually distinguishable. Therein the Court of Criminal Appeals recited that Gregg was suddenly, and unlawfully, seized at night by five presumably-armed deputy sheriffs, and was taken to the sheriff's office to investigate as part of the investigation of a robbery. *See id.* at 127–28. After being interrogated, Gregg was taken before a magistrate to receive a *Miranda* warning. *See id.* at 127. In the interim, two other persons had confessed to participating in the robbery. *See id.* at 128. After reading one of the other confessions, Gregg likewise confessed to the robbery. *See id.* On appeal, he contended that his confession, which flowed from an illegal seizure, should not have been admitted into evidence at trial. *See id.* at 127–28. The State responded that the confession was admissible because it had proven attenuation of the taint under *Brown v. Illinois. See id.* at 128. The Court of Criminal Appeals disagreed:

> In light of *Taylor v. Alabama*, we are compelled to disagree with the State that it has met the four [*Brown* ] factors set out above.

> In *Taylor v. Alabama*, the Supreme Court held that before a tainted confession may be legally sanitized, the prosecution must establish that the confession "originated outside the aura of coercion that surrounds the illegal detention."

*Id.* (citations omitted). Under this *Taylor v. Alabama* framework, the Court concluded that Gregg was not shown to be "outside the influence of the police custody" prior to his confession, and held that the State had not demonstrated attenuation of the taint. *See id.* at 130. Thus, the Court of Criminal Appeals was not convinced that, under the facts presented, Gregg's reading of an accomplice's confession was a significant intervening circumstance that removed the taint from the confession:

> We find that the record clearly reflects that at the time appellant read the statement he had been seized, was under the exclusive control of members of the Sheriff's office, and was unaided by counsel. Furthermore, before reading the other person's confession, appellant was unaware that he had been implicated in the robbery. *Considering the intimidating atmosphere and the coerciveness of the situation,* we are unable to state that appellant had total freedom of

choice in giving the confession after he had read Massengale's confession.

*Id.* at 129 (emphasis added).

However, *Gregg* did not announce a blanket rule that, as a matter of law, confronting an accused with untainted incriminating evidence cannot be a legitimate intervening event in any case.[4] After all, whether a confession was produced by free will must be answered upon the facts of each case and does not rely on a "talismanic test." *See Brown,* 422 U.S. at 603, 95 S.Ct. 2254. Instead, we read *Gregg* as holding that, in light of the flagrant and coercive misconduct of the law-enforcement personnel, Gregg's confession could not be said to have been "the product of a free will." *See Gregg,* 667 S.W.2d at 129; *Brown,* 422 U.S. at 603, 95 S.Ct. 2254. For example, we note that Gregg was taken before a magistrate before his confession,[5] a fact which has been held to constitute a "significant intervening" event. *See Bell,* 724 S.W.2d at 789 n. 5. Given the *Gregg* Court's disdain for the sheriffs' misconduct, however, even Gregg's appearance before a magistrate was insufficient to dissipate the taint of the illegal seizure. *See Gregg,* 667 S.W.2d at 130. Thus, although Gregg's appearance before a magistrate did not persuade the Court of Criminal Appeals to find attenuation of the taint under the facts of that case, such an event continues to be a significant intervening event in other cases. *See Bell,* 724 S.W.2d at 789 n. 5. Similarly, *Gregg* should not be read as rejecting the proposition that, *in an appropriate case,* an accused's confrontation with untainted evidence could serve as a legitimate intervening event.

Here, appellant repeatedly denied any involvement in the murder until he learned that Ochoa had implicated him in the crime. During a restroom break, appellant saw that Ochoa had been arrested. He was told that Ochoa had "given [him] up," and that Ochoa had identified appellant as the "main guy" during the shooting. The detectives then advised appellant of specific details from Ochoa's confession: "He's given every detail about what took place from the time you guys left climbing over the fence, just about knocking him over, going down, sliding down the bayou, swimming in the bayou[.]" Finally, appellant was told that Ochoa's account had been corroborated by another witness. Appellant then confessed to the murder. Under these facts, we conclude—as have courts in other jurisdictions in similar cases—that appellant's confession was not the result of his unlawful arrest but, rather, the product of appellant's voluntary decision to confess after learning his accomplice had done likewise. *See People v. Holman,* 250 Ill.App.3d 503, 189 Ill.Dec. 905, 620 N.E.2d 1222, 1230 (1993); *People v. Dale,* 189 Ill.App.3d 704, 136 Ill.Dec. 997, 545 N.E.2d 521, 533 (1989); *People v. Thomas,* 186 Ill.App.3d 782, 134 Ill.Dec. 535, 542 N.E.2d 881, 889 (1989); *Brewer v. State,* 271 Ark. 810, 611 S.W.2d 179, 182 (1981); *Allen,* 426 F.2d at 759; *see also State v. Stevens,* 574 So.2d 197, 204 (Fla.

4. In 1993, citing *Gregg,* we declined to find attenuation from the mere fact that an accomplice gave an incriminating statement. *See Griffin v. State,* No. C14–91–01227–CR, 1993 WL 46554, at *4 (Tex.App.-Houston [14th Dist.] Feb. 25, 1993, pet. ref'd) (not designated for publication). However, the record there did not clearly show that Griffin, the accused, was even aware of his companion's incriminating statement. *See id.* In addition, we noted that the incriminating statement itself may have resulted from an illegal arrest. *See id.; see also Taylor,* 457 U.S. at 692–93, 102 S.Ct. 2664 (declining to characterize, as intervening event, evidence that itself was fruit of illegal arrest). Therefore, *Griffin* can be distinguished and is not controlling here.

5. *See Gregg,* 667 S.W.2d at 127.

Dist.Ct.App.1991) (holding that defendant's confrontation with his mother's incriminating statement constituted an intervening event); *Commonwealth v. Wright,* 460 Pa. 247, 332 A.2d 809, 811 (1975) ("Wright denied any involvement in the shooting until he was confronted with his accomplice. It was this confrontation, rather than any exploitation of the circumstances of the arrest, which prompted his confession.").

We therefore conclude that appellant's confrontation with Ochoa's untainted confession[6] acted as a significant intervening event. Accordingly, this third attenuation factor weighs in the State's favor.

### D. Purpose and Flagrancy of Official Misconduct

The fourth *Brown* factor, in which courts examine the extent of law-enforcement misconduct, is one of the most important considerations in an attenuation analysis. *See Bell,* 724 S.W.2d at 789; *Self,* 709 S.W.2d at 668. When official misconduct is the most flagrantly abusive, the standard for the State to prove attenuation is elevated to require the "clearest indications of attenuation."[7] *See Bell,* 724 S.W.2d at 789. Examples of such abusive conduct may include "reliance on factors in making an arrest which were so lacking in

indicia of probable cause as to render belief in its existence entirely unreasonable; an arrest effectuated as a pretext for collateral objectives; or an arrest which is unnecessarily intrusive on personal privacy." *Id.* Similarly, the taint may be unattenuated if the accused was arrested for no apparent justification and with the sole intent to extract a confession by exploitation. *See id.* at 789–90.

In arguing flagrancy of the deputies' misconduct, appellant reminds us that, as of the time of his confession, he had been kept in a small windowless room for twenty-two hours and, during that time, had eaten only one meal. However, although these considerations may be pertinent in a *Jackson v. Denno* analysis,[8] appellant does not contend that his confession was involuntary as a result of coercion. Instead, appellant concedes that he voluntarily accompanied the detectives to the sheriffs' department, and that he freely consented to a DNA saliva test, search of his residence and vehicle, and polygraph examination. Although his movement *within* the sheriffs' department—a secure building— was restricted, appellant concedes that he was free to leave the facility until at least midnight on the second day, July 22.[9]

---

6. There has been no suggestion that Ochoa's written confession resulted from an illegality, because a warrant exception applies to Ochoa's arrest. *See* Tex.Code Crim. Proc. Ann. art. 14.03(a)(6) (Vernon Supp.2008) ("Any peace officer may arrest, without warrant ... a person who makes a statement to the peace officer that would be admissible against the person under Article 38.21 and establishes probable cause to believe that the person has committed a felony.").

7. This statement, from *Bell,* implies that there may be some overlap between the third and fourth *Brown* factors. *See also Morelos v. State,* 772 S.W.2d 497, 505 (Tex.App.-Houston [14th Dist.] 1989, pet. ref'd) (addressing both factors together, and noting that "[f]ree and

voluntary execution of a written consent to the search is an intervening factor that weighs heavily in favor of the State, but allegations of official misconduct in obtaining the consent would necessarily weaken the consent") (citation omitted).

8. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *see Smith v. State,* 779 S.W.2d 417, 428–29 (Tex.Crim.App. 1989) (evaluating voluntariness of confession by, *inter alia,* level of physical deprivation brought to bear on accused).

9. At argument, counsel for appellant rejected the suggestion that appellant was in custody following the polygraph examination at 6:10 p.m. Instead, it was contended that, although

Thus, we must conclude that appellant voluntarily remained at the sheriffs' department until he was actually placed in custody.

Appellant also acknowledges that his arrest, though warrantless, was supported by probable cause. The trial court found that Detective Reynolds failed to procure a warrant because "[i]n his mind he believed that he had probable cause to arrest the defendant and that a warrant was not necessary." The record also supports this finding, as Reynolds testified that he felt he could arrest appellant because of Ochoa's confession. This belief appears, from the record, to have been founded upon Reynolds's misunderstanding of the scope of Article 14.03(a)(6). Based on the record, the trial court therefore concluded that the officers had not engaged in flagrant misconduct.

We consider the facts of this case to be analogous to the police conduct involved in *Bell*, in which the arresting officer had probable cause to arrest Bell, but failed to procure a warrant because the officer believed that a warrant exception applied. *See Bell*, 724 S.W.2d at 785–87. The Court of Criminal Appeals classified that police conduct as falling "somewhere in between a technical violation and ... flagrant conduct[.]" *Id.* at 790. The Court concluded that the police conduct did not decisively weigh against attenuation of the taint. *See id.*

Ultimately, based on its resolution of the *Brown* factors, the *Bell* Court declined to find attenuation. *See id.* at 790–91. Although we classify the official misconduct here as analogous to that involved in *Bell*, however, we do not reach the same ultimate attenuation conclusion after weighing the *Brown* factors. In *Bell*, the Court found no intervening circumstance that

would militate in favor of admission of the confession. *See id.* at 789, 790. By contrast, we have held that appellant's confrontation with Ochoa's untainted confession served as a legitimate intervening event that was sufficient "to break the causal connection" between the illegal arrest and confession. *See id.*

Having weighed the pertinent *Brown* factors, then, we conclude on the record presented that the taint of appellant's unlawful arrest was attenuated.

## CONCLUSION

Although appellant was unlawfully arrested without a warrant, we hold the State carried its burden to prove, under *Brown v. Illinois* and *Bell v. State*, that the taint of the illegal arrest was attenuated. Therefore, we affirm the trial court's ruling denying appellant's motion to suppress his recorded confession.

appellant chose to remain at the sheriff's' department, a reasonable person would have believed he was free to leave the facility. *See Turner*, 252 S.W.3d at 577.