ACCEPTED
01-14-00527-CR
FIRST COURT OF APPEALS
HOUSTON, TEXAS
3/8/2015 3:11:21 PM
CHRISTOPHER PRINE
CLERK

## No. 01-14-00527-CR

### IN THE FIRST COURT OF APPEALS
### OF THE STATE OF TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/8/2015 6:11:21 PM
VOID K
CHRISTOPHER A. PRINE
Clerk

### FEANYICHI EZEKWESI UVUKANSI
*Appellant*

v.

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
3/9/2015 8:49:00 AM
CHRISTOPHER A. PRINE
Clerk

### THE STATE OF TEXAS
*Appellee*

On Appeal in Cause Number 1353181
From the 174th District Court of Harris County, Texas
Hon. Frank Price, Judge Presiding

### BRIEF FOR APPELLANT

ORAL ARGUMENT REQUESTED

**ALEXANDER BUNIN**
Chief Public Defender
Harris County, Texas

**BOB WICOFF**
State Bar of Texas No. 21422700
bob.wicoff@pdo.hctx.net
Attorney for Appellant

**JAYME REISLER**
Intern-Public Defender's Office
1201 Franklin, 13th floor
Houston, Texas 77002
Phone: (713) 368-0016
Fax: (713) 368-9278

i

## Identity of Parties and Counsel

| | |
|---|---|
| Appellant | Feanyichi Ezekwesi Uvukansi<br>TDCJ # 01939267<br>Robertson Unit<br>12071 FM 3522<br>Abilene, Texas 79601 |
| Presiding Judge | Hon. Frank Price<br>174th District Court<br>1201 Franklin<br>19th floor<br>Houston, Texas 77002 |
| Trial Prosecutor | Gretchen Flader<br>Kyle Watkins<br>Assistant District Attorneys<br>Harris County, Texas<br>1201 Franklin<br>Houston, Texas 77002 |
| Defense Counsel in Trial Court | Vivian King<br>Attorney at Law<br>3402 Dowling St., # 206<br>Houston, Texas 77004 |
| Defense Counsel on Appeal | Bob Wicoff<br>Assistant Public Defender<br>Harris County, Texas<br>1201 Franklin, 13th floor<br>Houston, Texas 77002 |
| | Jayme Reisler[1]<br>Legal Intern<br>Public Defender's Office<br>1201 Franklin, 13th floor<br>Houston, Texas 77002 |

---

[1] Ms. Reisler is a third-year student at the University of Houston Law Center and has provided valuable research assistance in the preparation of this brief.

i

# Table of Contents

**Page**

Identity of Parties and Counsel:                                    i

Table of Contents:                                                 ii

Index of Authorities:                                               v

Statement of the Case:                                             ix

Issues Presented:                                                   x

Statement of Facts:                                                 1

Summary of the Argument:                                           8

Issue One:                                                         10

The evidence is legally insufficient to prove that the Appellant is guilty of capital murder under Tex. Penal Code § 19.03(a)(7)(A), because there is no evidence which proves that the Appellant intentionally killed Carlos Dorsey

    Argument:

    A. Standard of review and applicable law                   10

    B. There was no evidence to prove that the Appellant shot Carlos     12
       Dorsey, that he solicited, encouraged, directed, aided or attempted
       to aid another person to shoot Carlos Dorsey, or that he had the
       specific intent to kill Carlos Dorsey

Issue Two:                                                         17

The trial court committed reversible error in denying the Appellant's timely request for a jury instruction on the lesser included offense of felony murder.

**Table of Contents (cont'd.)**

**Page**

Argument:

A. The trial court erred in refusing to submit an instruction on felony murder ........ 17

B. The trial court's error resulted in harm ........ 21

Issue Three: ........ 22

The trial court erred in denying the Appellant's motion to suppress the warrantless seizure of his cell phone, which resulted in constitutional error that was not harmless beyond a reasonable doubt

Argument:

A. Statement of Facts from Motion to Suppress Hearing ........ 22

B. General Standards of Review ........ 26

C. Issues presented regarding seizure of Appellant's cell phone ........ 27

   1. Did the officer have a right to enter the apartment of Lela Thomas and Camelia James? ........ 28

   Was entry justified in order to do a "protective sweep?" ........ 28

   Were officers given voluntary consent to enter the apartment? ........ 20

   2. Even if the officer's entry into the apartment had been legal, were the police officers authorized to seize the Appellant's cell phone? ........ 33

   Were the police authorized to seize the cell phone under the "plain view" doctrine? ........ 33

## Table of Contents (cont'd.)

|  | Page |
|---|---|
| 3. Was seizure of the cell phone justified as being a legal seizure made incident to Appellant's arrest? | 37 |
| The phone was not a weapon | 37 |
| There was no proof of an inventory search | 37 |
| Did the Appellant abandon his cell phone? | 39 |
| 4. "Independent source" and "attenuation of taint" | 40 |
| D. The erroneous denial of Appellant's motion to suppress evidence resulted in constitutional error that resulted in harm to the Appellant | 45 |
| Issue Four: | 48 |

The trial court erred in overruling defense counsel's objection to the prosecutor's closing argument, which interjected new and harmful facts into the proceedings through unsworn jury argument, namely, that a witness who had not testified at trial had given the Appellant's name as someone involved in the shooting.

| Argument: |  |
|---|---|
| A. Statement of Facts | 48 |
| B. Error and harm analysis | 51 |
| Prayer for Relief: | 55 |
| Certificate of Service | 56 |
| Certificate of Compliance: | 56 |

# Index of Authorities

**Cases**                                                                               **Page**

*Acosta v. State*, 411 S.W.3d 76 (Tex. App.-Houston [1ˢᵗ Dist.] 2013, no pet.) ................ 52

*Allridge v. State*, 850 S.W.2d 471 (Tex. Crim. App. 1991) ............................................30-31

*Aviles v. State*, No. 01-09-01017-CR, 2011 WL 346436 (Tex.App.-Houston. ................ 18
[1ˢᵗ Dist.] Feb, 3, 2011, pet. ref'd)(mem. op., not designated for publication)

*Bedolla v. State*, 442 S.W.3d 313 (Tex. Crim. App. 2014)................................................19, 21

*Bignall v. State*, 887 S.W.2d 21 (Tex. Crim. App. 1994) ....................................................... 17

*Brown v. State*, 270 S.W.3d 564 (Tex. Crim. App. 2008)...................................................... 11

*Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788 (1968) ......................................... 31

*Carmen v. State*, 276 S.W.3d 538 (Tex. App.-Houston [1ˢᵗ Dist.] 2008, pet. ref'd) .......... 20

*Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034 (1969).................................................... 37

*Clayton v. State*, 235 S.W.3d 772 (Tex. Crim. App. 2009)................................................... 11

*Cockrell v. State*, 933 S.W.2d 73 (Tex. Crim. App. 1996).................................................... 52

*Comer v. State*, 754 S.W.2d 656 (Tex. Crim. App. 1986)..................................................... 39

*Cruse v. State*, No. 01-13-00077-CR, 2014 WL 3607250 (Tex.App.-Houston. ................ 34
[1ˢᵗ Dist.] July 22, 2014, pet. ref'd)(mem. op., not designated for publication)

*Davila v. State*, 441 S.W.3d 751 (Tex. App.-Houston [1ˢᵗ Dist.] 2014, pet. ref'd)............ 41

*Davis v. State*, 74 S.W.3d 90 (Tex. App.-Waco 1999, no pet.) ............................................ 30

*Ervin v. State*, 331 S.W.3d 49 (Tex. App.-Houston [1ˢᵗ Dist.] 2010, pet. ref'd) .............. 10

*Giles v. State*, No. 13-06-00570-CR, 2007 WL 2390823 (Tex.App.-Corpus Christi- ... 32
Edinburg August 23, 2007, no pet.)(mem. op., not designated for publication)

# Index of Authorities (cont'd)

**Cases**                                                                                                    **Page**

*Henry v. State*, 263 S.W.3d 151 (Tex. App.-Houston [1st Dist.] 2007, no pet.)................ 21

*Hernandez v. State*, 60 S.W.3d 106 (Tex. Crim. App. 2001)................................................. 45

*Hooper v. State*, 214 S.W.3d 9 (Tex. Crim. App. 2007)........................................................ 11

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979) ................................................. 10, 11

*Johnson v. State*, 871 S.W.2d 744 (Tex. Crim. App. 1994) ...................................................... 42

*Keehn v. State*, 279 S.W.3d 330 (Tex. Crim. App. 2009)......................................................... 33

*Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009)......................................................... 10

*McDuff v. State*, 939 S.W.2d 607 (Tex. Crim. App. 1997) ....................................................... 39

*McKinney v. State*, 207 S.W.3d 366 (Tex. Crim. App. 2006) ................................................... 18

*Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093 (1990) ......................................................... 29

*Mathis v. State*, 67 S.W.3d 918 (Tex. Crim. App. 2002)......................................................... 17

*Maxwell v. State*, 73 S.W.3d 278 (Tex. Crim. App. 2002) ....................................................... 27

*Mazuca v. State*, 375 S.W.3d 294 (Tex. Crim. App. 2013) .................................................43-44

*Miller v. State*, 393 S.W.3d 255 (Tex. Crim. App. 2012) ......................................................... 33

*Moberg v. State*, 810 S.W.2d 190 (Tex. Crim. App. 1991) .................................................37-38

*Monge v. State*, 276 S.W.3d 180 (Tex. App.-Houston [14th Dist.] 2009, no pet.)............. 43

*Moskey v. State*, 333 S.W.3d 696 (Tex. App.-Houston [1st Dist.] 2010, no pet.).............. 38

*Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) .........................................45, 48, 53

*Nelson v. State*, 405 S.W.3d 113 (Tex. App.-Houston [1st Dist.] 2013, pet. ref'd).......14-15

# Index of Authorities (cont'd)

**Cases**                                                    **Page**

*Ohio v. Robinette*, 519 U.S. 33, 117 S.Ct. 417 (1996) ............................................................. 30

*Powell v. State*, 194 S.W.3d 503 (Tex. Crim. App. 2006) ...................................................... 12

*Ray v. State*, 106 S.W.3d 299 (Tex. App.-Houston [1st Dist.] 2003, no pet.) ................... 22

*Reasor v. State*, 988 S.W.2d 877 (Tex. App.-San Antonio 1999), ................................29-30
    rev'd on other grounds, 12 S.W.3d 813 (Tex.Crim.App. 2000)

*Robalin v. State*, 224 S.W.3d 470 (Tex. App.-Houston [1st Dist.] 2007, no pet.) ........21-22

*Roberts v. State*, 273 S.W.3d 322 (Tex. Crim. App. 2008) ................................. 12, 16, 18, 19

*Roth v. State*, 917 S.W.2d 292 (Tex. App.-Austin 1995, no pet.) ................................31-32

*Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041 (1973) ........................................... 30

*Segura v. United States*, 468 U.S. 796 (1984) ...............................................................40-41

*Sims v. State*, 84 S.W.3d 805 (Tex. App.-Houston [1st Dist.] 2002, no pet.) .................... 42

*State v. Dobbs*, 323 S.W.3d 184 (Tex. Crim. App. 2010) ..................................................... 33

*State v. Ibarra*, 953 S.W.2d 242 (Tex. Crim. App. 1997) ..................................................... 30

*State v. Kelly*, 204 S.W.3d 808 (Tex. Crim. App. 2006) ....................................................... 26

*Segura v. United States*, 468 U.S. 796 (1984) ...............................................................40-41

*United States v. Palmer*, 37 F.3d 1080 (5th Cir. 1994), cert. denied, ................................. 53
    514 U.S. 1087 (1995)

*Washington v. State*, 417 S.W.3d 713 (Tex. App.-Houston [14th Dist.] 2013, pet. ref'd) .. 18

*Wehrenberg v. State*, 416 S.W.3d 458 (Tex. Crim. App. 2013) ........................................40, 41

# Index of Authorities (cont'd)

**Cases**                                                                                                            **Page**

*Wesbrook v. State*, 29 S.W.3d 103 (Tex. Crim. App. 2000) ................................................. 17

*Williams v. State*, 235 S.W.3d 242 (Tex. Crim. App. 2007) ...........................................10-11

**Statutes and Rules**

United States Constitution, Fourth Amendment ............................................................ 30

Tex. Penal Code Ann., sec. 19.03(a)(7)(A) .................................................................... *passim*

Tex. Penal Code Ann., sec. 22.05 ...................................................................................... 17

Tex. R. App. P. 44.2(a) ........................................................................................................ 45

Tex. R. App. P. 44.2(b) ........................................................................................................ 55

**Other Authority**

*George E. Dix & John M. Schmolesky,* 41 Texas Practice and Procedure .......................... 43
    Sec. 18:29 (3rd ed. 2011)

*George E. Dix & John M. Schmolesky,* 43 Texas Practice and Procedure .....................52-53
    Sec. 45:9 (3rd ed. 2011)

## STATEMENT OF THE CASE

Feanyichi Ezekwese Uvukansi was indicted in cause number 1353181 for capital murder, alleged to have occurred on or about June 20, 2012 (C.R. at 27); *See* Tex. Penal Code, § 19.03(a)(7)(A)(murder of more than one person during the same criminal transaction). The case was tried in June of 2014 and a jury found Uvukansi guilty of capital murder (C.R. at 1091). The trial court sentenced him to life without parole (10 R.R. at 42; C.R. at 1092). A motion for new trial was filed (C.R. at 1108). A hearing was held pursuant to the motion and the trial court denied the motion on September 2, 2014 (C.R. at 1118).

# ISSUES PRESENTED

## Issue One

The evidence is legally insufficient to prove that the Appellant is guilty of capital murder under Tex. Penal Code § 19.03(a)(7)(A), because there is no evidence which proves that the Appellant intentionally killed Carlos Dorsey

## Issue Two

The trial court committed reversible error in denying the Appellant's timely request for a jury instruction on the lesser included offense of felony murder.

## Issue Three

The trial court erred in denying the Appellant's motion to suppress the warrantless seizure of his cell phone, which resulted in constitutional error that was not harmless beyond a reasonable doubt.

## Issue Four

The trial court erred in overruling defense counsel's objection to the prosecutor's closing argument, which interjected new and harmful facts into the proceedings through unsworn jury argument, namely, that a witness who had not testified at trial had given the Appellant's name as someone involved in the shooting.

## A. Witnesses present at the time of the shooting

After performing at the Blue Room Club on June 20, 2012, Frazier Thompson, a rap singer who performed under the stage name "Traethatruth," walked out of the front entrance of the club. Within seconds, he was shot in the back (7 R.R. at 34-36, 46). He did not see who did the shooting, nor did he see whether anyone else was shot (7 R.R. at 35).

Oscar Jeresano worked as a valet that night, parking cars for concertgoers who were attending the show (8 R.R. at 6). The concert began around 9:00 p.m. Jeresano testified that it was "a pretty hectic night" due to there being live performances at two of the clubs in the center.

The concert ended shortly after 2:00 a.m. (8 R.R. at 14). As patrons exited the club, a crowd of as many as 100 people gathered near the front door, some of them waiting to see Traethatruth exit the club, others congregating at the valet stand, trying to get their cars (8 R.R. at 16).

As Jeresano was responding to a woman who was trying to retrieve her car, he heard gunshots (8 R.R. at 18). He turned around to see fire coming from the muzzle of a gun (8 R.R. at 19-20). He found himself facing the shooter (8 R.R. at 22). Jeresano explained that he did not run because he "just froze" (8 R.R. at 23). He described the shooter as having a "determined look" on his face (8 R.R. at 24). The shooter was moving as he shot, "kind of jumping." Once Jeresano "unfroze," he tried

to hide under a white Challenger that was parked nearby. From his position on the ground, Jeresano was able to see bodies fall (8 R.R. at 29). He estimated that he heard approximately 15 shots fired. People in the crowd were screaming and crying (8 R.R. at 29).

Jeresano saw only one shooter (8 R.R. at 30, 59). He described what he saw as the shooter "shooting toward the crowd" (8 R.R. at 101). He denied knowing who shot whom (8 R.R. at 102). Jeresano did not volunteer any information to police at the scene because he had a pending federal criminal charge of his own, which led him to assume that they would not trust his account of events (8 R.R. at 32). He explained to the jury that he had already pled guilty in the federal case, where he was charged with possession of ten kilos of cocaine, and was awaiting sentencing, where he faced ten years to life in prison (8 R.R. at 35).

After consulting with his attorney, Jeresano gave a recorded statement to the police, approximately nine days following the shooting (8 R.R. at 35). When he met with police to give his statement, Jeresano was shown a photo spread, where he picked the Appellant as the person whom he believed had been the shooter (8 R.R. at 39). Jeresano also identified the Appellant in open court as being the shooter (8 R.R. at 39). While viewing the photo spreads shown to him by the police, Jeresano also recognized the photograph of another man he remembered seeing at the club that night, but whom he did not see do any shooting (8 R.R. at 42).

On cross-examination, Jeresano conceded that he only pled guilty in his federal case on July 12, 2012, after he had witnessed the shooting and after speaking to the lawyer who represented him in his federal case (8 R.R. at 46). He denied being offered any benefit in the federal case in exchange for his cooperation, and specifically denied any awareness that by testifying for the State, he would earn "a 5K.1 reduction under the federal sentencing guidelines." (8 R.R. at 48-49). However, despite his claim of being unaware of any benefit as a result of testifying for the State, Jeresano did admit that his sentencing (which subjected him to deportation) had repeatedly been reset pending his testimony in the instant case, and had not yet taken place at the time of trial in June of 2014 (8 R.R. at 47-48). As for any other benefits that inured to him as a result of testifying in this case, Jeresano could not recall whether his GPS monitor (a condition of his pretrial release on the drug possession case) was removed once he began to cooperate with police as a witness to the shooting (8 R.R. at 50-51).

## B. Police responders and investigators

H.P.D. Officer Walter Reyes was dispatched to the scene of the shooting at 3:10 a.m. (7 R.R. at 50). When he arrived, Reyes encountered "a chaotic scene…a large crowd running around frantic." (7 R.R. at 56). Three of the shooting victims were pronounced dead at 3:16 a.m. (7 R.R. at 60).

Officer Woodrow Tompkins of the H.P.D. Crime Scene Unit arrived at the scene of the shooting about 4:00 a.m. that morning (7 R.R. at 90). Due to the large

crowd and the possibility that evidence might be tampered with or disturbed, Tompkins called for two more crime scene unit officers to assist him (7 R.R. at 93-94). As he was testifying about various items of evidence he recovered from the scene, Tompkins observed that it was not possible to deduce, from where the shell casings were recovered, where the shooter had been standing when doing the shooting (7 R.R. at 115). This was because the shooter could have been moving while shooting, people in the crowd could have kicked the shell casings, and cars driving through the parking lot could have displaced shell casings or even picked up some of the casings in the tires' treads (7 R.R. at 115).

Sergeant John Brooks, a homicide investigator with the Houston Police Department, testified that during his investigation, Daveon Griffin was developed as a suspect in the shooting (8 R.R. at 142). On November 8, 2013, Oscar Jeresano identified Griffin in a photo spread as being someone he remembered being at the nightclub the night of the shootings, although Jeresano did not identify Griffin as a shooter (8 R.R. 146, 152). Brooks testified that Oscar Jeresano had told him that there could have been a second shooter (8 R.R. at 160).

H.P.D. Sergeant Chris Cegielski, who was assigned to the gang murder squad, was the lead homicide investigator in the case. He was called to the scene of the shooting about three hours after it happened because one of the deceased complainants, Coy Thompson (a/k/a/ "Poppa C") was a member of the Crips. Two

Crips members, Josh Warren and Dedrick Johnson, had been linked to the murders in January of 2012 of two members of the Bloods, Trae Bush and Germane Burnett (8 R.R. at 169). Another Blood, DeShawn Jackson, had also been shot but survived. Jackson identified Crips members Warren and Johnson as the shooters in that earlier murder. Coy Thompson was thought to be the Crip who had ordered the shooting of the two Bloods, which Cegielski believed made Coy an obvious target for a Blood revenge killing (8 R.R. at 170).

In the week immediately following the June 20th shootings, Cegielski interviewed many potential witnesses but got nowhere. Finally, on June 28th, about eight days after the shootings, Cegielski met with Dedrick Foster, who named a suspect (8 R.R. at 198). Cegielski also testified concerning the interviews he had with Oscar Jeresano. He stated that Jeresano identified the Appellant as one of the shooters (8 R.R. at 206). Jeresano also identified Dexter Brown (whom Cegielski believed was another shooter), but Jeresano only recalled Brown as having been present at the club that night, not as someone he saw shooting (8 R.R. at 207). When he was interviewed, Dexter Brown initially denied being at the club that night, but later conceded that he had been (8 R.R. at 212, 217). Cegielski spoke to a prosecutor who offered to accept charges on Brown, but Cegielski was not ready to do so and Brown was released.

Cegielski then testified concerning photographs that were found on the Appellant's cellphone. State's exhibit 56 was a photograph that was taken within an hour or so after the shooting (8 R.R. at 233). The photograph depicted, among others, Dexter Brown, Devonte Bennett, and Deveon Griffin (8 R.R. at 233-234). State's exhibit 55, another photograph taken about an hour after the shooting, depicted the Appellant along with those who were shown in State's exhibit 56 (8 R.R. at 237).

On July 11, 2012, Cegielski learned that Dedrick Foster had been murdered (8 R.R. at 239). The Appellant was in custody at the time (8 R.R. at 239).

Officer Cegielski conceded that his theory that the Appellant was the shooter was not the only theory in the case. For example, Cegielski had also considered the possibility that a group called the Bellfort Blood had retaliated against Coy (8 R.R. at 252). Another theory had been that some people from New Orleans had committed the murders (8 R.R. at 252). Additionally, Coy's mother had told the police that Coy's "baby mama" Jasmine might have had something to do with Coy being killed (8 R.R. at 254). Cegielski admitted that he did not know whether Coy had obtained a gun that night, after he had texted a man known as Black Willow, asking him to bring a gun to the club (8 R.R. at 181-182, 254). Cegielski's investigation led him to conclude that Coy had a lot of enemies, and that he robbed people for their cocaine. Cegielski agreed on cross-examination that the Appellant was not responsible for the murder of Dedrick Foster (8 R.R. at 261).

## C.  Expert testimony

Diana Donley, a criminalist with the Houston Forensic Science Center, testified as to DNA analysis she conducted on bullet casings recovered from the crime scene (7 R.R. at 150). She was unable to obtain any full DNA profiles from the shell casings, and so was unable to match them to any profiles from any of the witnesses, complainants or the Appellant (7 R.R. at 151-152).

Kimberly Zeller was a firearms examiner with the Houston Forensic Science Center (7 R.R. at 157).  Zeller examined eighteen cartridge casings that were recovered by the police at the scene of the shooting. From analyzing these cartridge casings, Zeller concluded the following:

1) All eighteen cartridge casings were ejected from .40 caliber firearms (7 R.R. at 170, 182);

2) Ten of the cartridge casings came from one .40 caliber weapon, and the remaining eight came from a second firearm (7 R.R. at 169, 182, 184).

Dr. Roger Milton, Jr., an assistant medical examiner at the Harris County Institute of Forensic Sciences (9 R.R. at 50), performed autopsies on the three people who were killed in the incident, with the following findings:

1) Carlos Dorsey died of gunshot wounds. He was shot from a distance of greater than two feet away. (9 R.R. at 53-62; 11 R.R.: State's exhibits 60-64).

No bullet fragments were recovered from Dorsey's body (11 R.R.: State's Exhibit 60, at page 4);

2) Erica Dotson also died of gunshot wounds, also from a distance exceeding two feet (9 R.R. at 62-74; 11 R.R.: State's exhibits 66-76). A "large-caliber" bullet fragment was recovered from one of Dotson's wounds (11 R.R.: State's exhibit 66, at pages 4-5; State's exhibits 74 and 75);

3) Coy Thompson also died of gunshot wounds (9 R.R. at 75-82; 11 R.R.: State's exhibits 79-88). A large-caliber bullet fragment was recovered from Thompson's thigh (9 R.R. at 81; 11 R.R.: State's exhibit 79, at page 4; State's exhibit 87).

### SUMMARY OF THE ARGUMENT

In Issue One, the Appellant argues that the evidence is legally insufficient to prove that he is guilty of capital murder under Tex. Penal Code § 19.03(a)(7)(A), the "multiple-murder" provision of the capital murder statute. Such provision requires proof that each death relied upon for conviction have been intentional or knowing. As to complainant Carlos Dorsey, the circumstantial evidence is legally insufficient to prove an intentional killing of Dorsey, since there is no evidence that the Appellant himself shot Dorsey, no evidence to prove that the Appellant solicited, encouraged, directed, aided or attempted to aid another person in shooting Dorsey, there was no motive to kill Dorsey and no evidence of any specific intent to kill Dorsey. At most,

the evidence proves an intentional killing of Coy Thompson and the felony murder of Carlos Dorsey, which is not sufficient to constitute capital murder under Tex. Penal Code § 19.03(a)(7)(A).

In Issue Two, the Appellant complains of the trial court's refusal, upon timely request, to instruct the jury on the lesser-included offense of felony murder, with deadly conduct as the underlying felony. Felony murder is a lesser-included offense of capital murder, and the evidence established felony murder as a valid, rational alternative to the charged offense under these facts.

In Issue Three, the Appellant argues that the trial court abused its discretion in overruling his motion to suppress the warrantless seizure of his cell phone, which resulted in the admission of evidence from the phone that was not harmless beyond a reasonable doubt.

In Issue Four, the Appellant complains of the prosecutor's closing argument, which interjected new and extremely prejudicial evidence in front of the jury through the unsworn comments of the prosecutor. Specifically, despite her repeated assurances to the court and to defense counsel that she would not introduce such information in front of the jury, the prosecutor argued at closing, over defense counsel's objection, that a witness who had not testified at trial had given the Appellant's name as someone involved in the shooting.

**The evidence is legally insufficient to prove that the Appellant is guilty of capital murder under Tex. Penal Code § 19.03(a)(7)(A), because there is no evidence which proves that the Appellant intentionally killed Carlos Dorsey**

## Argument

### A.   Standard of review and applicable law

A challenge to the legal sufficiency of the evidence is reviewed under the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318-20, 99 S. Ct. 2781, 2788-89 (1979). *See Ervin v. State,* 331 S.W.3d 49, 52-56 (Tex. App.-Houston [1st Dist.] 2010, pet. ref'd)(citing *Brooks v. State,* 323 S.W.3d 893, 894-913 (Tex. Crim. App. 2010)). Under the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational factfinder could have found that each essential element of the charged offense was proven beyond a reasonable doubt. *See Jackson*, 443 U.S. at 317–19, 99 S. Ct. at 2788–89; *Laster v. State,* 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Evidence is insufficient under this standard in four circumstances: (1) the record contains no evidence probative of an element of the offense; (2) the record contains a mere "modicum" of evidence probative of an element of the offense; (3) the evidence conclusively establishes a reasonable doubt; and (4) the acts alleged do not constitute the criminal offense charged. *See Jackson*, 443 U.S. at 314, 318 n.11, 320, 99 S. Ct. at 2786, 2789 & n.11; *Laster*, 275 S.W.3d at 518; *Williams v. State*, 235 S.W.3d 742, 750

(Tex. Crim. App. 2007). The sufficiency of the evidence standard gives full play to the responsibility of the factfinder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State,* 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008) (stating jury is sole judge of credibility of witnesses and weight to give their testimony). An appellate court presumes that the factfinder resolved any conflicts in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *see also Clayton*, 235 S.W.3d at 778 (reviewing court must "presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination").

In viewing the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. In determining the sufficiency of the evidence, a reviewing court examines "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). Finally, the "cumulative force" of all the circumstantial evidence can be sufficient for a jury to find the accused guilty beyond a reasonable doubt, even if every fact does not

"point directly and independently to the guilt of the accused." *See Powell v. State,* 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

Under Tex. Penal Code § 19.03(a)(7)(A):

(a) A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and:

(7) The person murders more than one person:

(A) during the same criminal transaction.

In order to convict a person of capital murder under the above multiple-murder theory, "each death must be intentional or knowing-there must be a discrete 'specific intent to kill' as to each death." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008).

**B. There was no evidence to prove that the Appellant shot Carlos Dorsey, that he solicited, encouraged, directed, aided or attempted to aid another person to shoot Carlos Dorsey, or that he had the specific intent to kill Carlos Dorsey.**

Considering the evidence in the light most favorable to the verdict, the following conclusions can be made:

**1. The evidence does not establish that the Appellant shot Carlos Dorsey.**

Police found eighteen (18) .40 caliber shell casings at the scene. Ten casings were fired from one weapon, eight from a second weapon (7 R.R. at 169, 170, 182, 184). DNA testing yielded no results from the casings (7 R.R. at 152). No bullet fragment was recovered from the body of complainant Carlos Dorsey (11 R.R.: State's

- 12 -

exhibit 60, at page 4). That is, nothing from the autopsy served to connect the Appellant to Dorsey's killing through ballistics evidence.

The only eyewitness to the shooting, Oscar Jeresano, testified that he saw only one person shooting. He identified that person as the Appellant (8 R.R. at 30, 39, 59). He did tell Officer Brooks that there could have been a second shooter (8 R.R. at 160). Jeresano only saw the Appellant with one gun (8 R.R. at 23). In any case, although no one identified a second shooter, or even saw a second shooter, the State's theory of the case was that there was clearly a second shooter (10 R.R. at 36). There was no testimony that the Appellant actually shot anyone, only that he was shooting into the crowd (8 R.R. at 101-102; 157-160).

**2. The evidence does not establish that the Appellant solicited, encouraged, directed, aided or attempted to aid another person in shooting Carlos Dorsey.**

The State posited several possibilities as to who the second shooter might be, but no one was ever ultimately identified as the second shooter (8 R.R. at 253). H.P.D. Sergeant John Brooks testified that Daveon Griffin was "a potential secondary suspect," but Oscar Jeresano could only recall seeing Griffin at the nightclub the night of the incident. He did not identify Griffin as a shooter (8 R.R. at 146). Jeresano also identified Dexter Brown as having been at the club, but again, did not identify him as a shooter (8 R.R. at 157, 207-208). Officer Cegielski believed that Brown may have been one of the other shooters, but he did not say why, nor did he link Brown to the

Appellant. Brown was never charged in the shooting (8 R.R. at 216). Devonte Griffin was developed as another potential suspect, but again, the record is devoid of any information as to why he was a suspect, or what relationship there may have been between him and the Appellant (8 R.R. at 242). A woman named April Campbell told Officer Cegielski that Kedrick Jones was a potential suspect, but again, there was no testimony or evidence connecting Jones to the Appellant (8 R.R. at 248-250).

Officer Cegielski conceded that his theory that the Appellant was the shooter was not the only theory in the case. For example, Cegielski had also considered the possibility that a group called the Bellfort Blood shot Thompson as retaliation (8 R.R. at 252). Another theory had been that some people from New Orleans had committed the murders (8 R.R. at 252). Additionally, Thompson's mother told the police that Coy's "baby mama" Jasmine might have had something to do with Coy being killed (8 R.R. at 254). Cegielski admitted that he did not know whether Coy had obtained a gun the night he was killed, after he had texted a man known as Black Willow, asking him to bring a gun to the club (8 R.R. at 181-182, 254). Cegielski's investigation led him to conclude that Coy had a lot of enemies, and that he robbed people for their cocaine.

3. **The evidence does not establish that the Appellant had the specific intent to kill Carlos Dorsey.**

Although motive is not an element of the offense of murder, it is relevant as a circumstance tending to prove guilt. *Nelson v. State*, 405 S.W.3d 113, 124 (Tex. App.-

Houston [1st Dist.] 2013, pet. ref'd). Thus, in terms of whether the circumstantial evidence in this case is sufficient to prove that the Appellant intentionally killed Coy Thompson, Jeresano's testimony that the Appellant was the shooter, along with his testimony that the shooter had "a determined look" as he shot, along with a motive to kill Coy Thompson (as revenge for his suspected involvement in the earlier killing of the Appellant's fellow gang member) all likely suffice to constitute circumstantial evidence that was legally sufficient to prove that the Appellant intentionally killed Coy Thompson.

However, absolutely no motive was established to kill Carlos Dorsey, who was apparently a bystander. If the existence of a motive is relevant as a circumstance tending to prove the Appellant's guilt of intentionally killing Coy Thompson, then the lack of motive should be relevant determining whether there was a specific intent to kill Carlos Dorsey.

Oscar Jersano testified that the shooter "was moving…he was kind of jumping. See, he was trying to get to his car and he was kind of jumping" (7 R.R. at 26). As stated *supra*, there was no evidence that the Appellant shot Dorsey or that he encouraged another to do so (as opposed to the other shooter doing so independent of any involvement with the Appellant). However, even assuming, *arguendo*, that there is legally sufficient circumstantial evidence to support the theory that the Appellant shot Carlos Dorsey, or that another person acting as a party with the Appellant shot

Dorsey, there is still nothing to support an intentional killing of Dorsey under either theory.

Even assuming the Appellant shot Coy Thompson, or was a party to shooting Thompson, the evidence only proves that Dorsey was shot due to indiscriminate shooting into the crowd, not with any intention that Dorsey die. Even in a light most favorable to the jury's verdict, the killing of Dorsey was felony murder.

In order to prove that the Appellant was guilty of capital murder under Tex. Penal Code § 19.03(a)(7)(A), "each death must be intentional or knowing-there must be a discrete 'specific intent to kill' as to each death." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008). Because the circumstantial evidence did not prove that the Appellant had the specific intent to kill Carlos Dorsey, the evidence fails to prove that both murders alleged in the indictment were intentional. Thus, this Court should vacate the judgment of capital murder, reform the judgment to reflect a conviction for murder, and remand the case to the trial court for a new punishment hearing.

**The trial court committed reversible error in denying the Appellant's timely request for a jury instruction on the lesser included offense of felony murder.**

## Argument

### A. The trial court erred in refusing to submit an instruction on felony murder.

Defense counsel requested in writing a jury charge on the lesser-included offense of felony murder with deadly conduct as the underlying felony. *See* Tex. Penal Code Ann. § 22.05 (C.R. at 1074). The trial court denied the request (C.R. at 1076).

The Court of Criminal Appeals has implemented a two-prong test to determine whether a charge on a lesser-included offense should be given. *Mathis v. State,* 67 S.W.3d 918, 925 (Tex. Crim. App. 2002). The first step is to determine whether the offense is a lesser-included offense of the offense charged. *Id.* The second prong of the test then requires an evaluation to determine whether some evidence exists that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense. *Id.* In other words, the evidence must establish the lesser-included offense as a valid, rational alternative to the charged offense. *Wesbrook v. State,* 29 S.W.3d 103, 113 (Tex. Crim. App. 2000). Anything more than a scintilla of evidence is sufficient to entitle a defendant to a lesser charge. *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994).

The Appellant was charged with capital murder under the multiple-murder theory provision codified in Tex. Penal Code Ann. § 19.03(a)(7)(A). In order to convict a person of capital murder under such section, "each death must be intentional or knowing-there must be a discrete 'specific intent to kill' as to each death." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008). Felony murder is a lesser-included offense of capital murder. *McKinney v. State*, 207 S.W.3d 366 (Tex. Crim. App. 2006).

The question thus becomes whether some evidence exists that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser offense of murder because either of the two deaths alleged in the indictment were not caused with the specific intent to kill, but were instead committed "in the course of and in furtherance of the commission of" felony deadly conduct, specifically, intentionally or knowingly discharging a firearm at or in the direction of one or more individuals. Deadly conduct may form the basis of felony murder. *See Washington v. State*, 417 S.W.3d 713, 721 (Tex. App.-Houston [14th Dist.] 2013, pet. ref'd); *See also Aviles v. State,* No. 01-09-01017-CR, 2011 WL 346436, at *5 (Tex. App.-Houston [1st Dist.] Feb. 3, 2011, pet. ref'd)(mem. op., not designated for publication).

It is critical to note in this regard that even if only one of the two deaths had been attributable to felony murder, rather than an intentional murder, then a capital murder conviction would not have been appropriate. As stated *supra,* under the

multiple-murder provision of Tex. Penal Code Ann. § 19.03(a)(7)(A), "each death must be intentional or knowing-there must be a discrete 'specific intent to kill' as to each death." *Roberts v. State*, 273 S.W.3d 322, 330 (Tex. Crim. App. 2008). Thus, if the jury had concluded, for example, that whereas the Appellant, acting alone or as a party, intended to kill Coy Thompson (whom the Appellant arguably had some motive to kill), but the jury further believed that Carlos Dorsey was killed by indiscriminate shooting into the crowd (whether by the Appellant, a co-conspirator or someone else altogether), with no intent to kill him, then the Appellant would not have been guilty of capital murder but murder.

Although the requested instruction asks for the lesser-included offense of felony murder as applied to both complainants (C.R. at 1074), this request was certainly adequate to alert the trial court that the evidence had raised the issue of whether one *or* both complainants had been killed in the course of felony deadly conduct (*i.e.*, a felony murder) and so an appropriate charge applying felony murder was being requested. To avoid forfeiture of a complaint on appeal, all a party has to do is let the trial judge know what he wants and why he thinks he is entitled to it and do so clearly enough for the judge to understand the request at a time when the trial court is in a proper position to do something about it. *Bedolla v. State,* 442 S.W.3d 313, 316 (Tex. Crim. App. 2014)(where defense counsel requested jury instruction on "self-defense," such was sufficient to avoid forfeiture of complaint on appeal that trial

court had erred in refusing instruction, despite State's claim that requested charge was not specific enough to alert trial court to which type of self-defense charge was being requested); *Carmen v. State,* 276 S.W.3d 538, 541 (Tex. App.-Houston [1st Dist.] 2008, pet. ref'd)("'Magic words' are not required; a complaint will be preserved if the substance of the complaint is conveyed to the trial judge.")(quoting *Bennett v. State,* 235 S.W.3d 241, 243 (Tex.Crim.App.2007)).

Thus, by requesting a charge on felony murder with deadly conduct as the underlying felony, counsel adequately preserved the complaint raised now, which is that the evidence certainly raised felony murder, rather than intentional murder, as a rational alternative to the death of Carlos Dorsey, and a jury instruction allowing the jury to find the Appellant guilty of the lesser offense of murder, due to evidence having been raised that there was no "discreet intent to kill" Dorsey, was appropriate.

Jurors were presented evidence of a "a chaotic scene…a large crowd running around frantic" (7 R.R. at 56), following 18 shots being fired in rapid succession into a crowd, the only eyewitness admitting that he did not even see the second shooter. Among other scenarios, a juror would be perfectly rational under the facts of this case in concluding that the Appellant (or his co-conspirator) specifically intended to kill Coy Thompson and did so, and then, as he ran away, fired indiscriminately into the crowd, not intending to kill anyone but killing Dorsey and Dotson. Indeed, Oscar Jersano testified that the shooter "was moving…he was kind of jumping. See, he was

trying to get to his car and he was kind of jumping" (7 R.R. at 26). The killing of Dorsey, whom the Appellant had no motive to kill, would be a felony murder in such instance. Another rational conclusion would be that while the Appellant fled, his co-conspirator fired indiscriminately into the crowd to cause a distraction and to provide cover, but without any specific intent to kill Dorsey.

## B. The trial court's error resulted in harm

If the trial court errs in regard to the jury charge in a criminal case, and the appellant timely objects to that error at trial, as in the instant case, harm is assessed by conducting an *Almanza* harm analysis. *See Henry v. State*, 263 S.W.3d 151, 156 (Tex. App.-Houston [1st Dist.] 2007, no pet)("'Some' harm in an *Almanza* analysis means 'any' harm; thus, if the charging error causes any actual harm to the appellant, as opposed to 'theoretical harm,' then the error requires a reversal of the judgment of the trial court."). In this case, appellant properly objected to the charge and requested an instruction on the lesser-included offense of felony murder. As stated *supra*, the requested charge was certainly sufficient to alert the trial court to what was being requested. *Bedolla v. State,* 442 S.W.2d 313, 316 (Tex. Crim. App. 2014).

If the charge error involves the absence of a lesser-included offense [instruction] that leaves the jury with the sole option to convict the appellant of the charged offense or to acquit him, some harm exists. *Henry,* 263 S.W.3d at 156 (citing *Saunders v. State,* 913 S.W.2d 564, 572 (Tex. Crim. App. 1995)). *Robalin v. State,* 224

S.W.3d 470, 477 (Tex. App.-Houston [1st Dist.] 2007, no pet.)(stating same); *Ray v. State,* 106 S.W.3d 299, 302-303 (Tex. App.-Houston [1st Dist.] 2003, no pet)(same).

Because the trial court's error in refusing the requested charge left the jury with the sole option of convicting the appellant of capital murder or acquitting him, the error harmed the Appellant and he is entitled to a new trial.

## Issue Three

**The trial court erred in denying the Appellant's motion to suppress the warrantless seizure of his cell phone, which resulted in constitutional error that was not harmless beyond a reasonable doubt**

## Argument

The Appellant filed a pre-trial motion to suppress evidence seized from his cell phone, complaining that the initial seizure of his phone in a third person's residence was done without a warrant and was not incident to his arrest (C.R. at 853). The trial court held a hearing pursuant to the motion.[2]

### A. Statement of Facts from Motion to Suppress Hearing

On the afternoon of July 3, 2012, armed with a warrant to arrest the Appellant, eight police officers surrounded an apartment on Yale Street in Houston (6 R.R. at 21). The officers did not have a search warrant. H.P.D. Sergeant Clint Ponder

---

[2] At the hearing, both H.P.D. Officer Ponder and the prosecutor clarified that although police officers had initially obtained a warrant or order to "ping" the Appellant's phone, meaning they obtained permission to locate his phone (and therefore the Appellant himself) through GPS tracking, there was no search warrant to seize the phone (6 R.R. at 13, 15)

explained that "We had an arrest warrant. We weren't looking for evidence, therefore, there was no need for a search warrant on our part" (6 R.R. at 20).

Ponder, accompanied by several other officers, knocked on the door (6 R.R. at 23). A woman who was later identified as Camelia James opened the door (6 R.R. at 24, 41). As Ponder was showing James a photo of the Appellant, the Appellant called from upstairs, "Hey, I'm coming down." (6 R.R. at 25). Without incident, he came downstairs, where he was frisked, handcuffed and put in a police car (6 R.R. at 28).

Sergeant Ponder, who was the only officer on the scene of the Appellant's arrest to testify at the hearing, claimed ignorance as to how police came into possession of the Appellant's cell phone (6 R.R. at 32). He denied that the police were searching for a cell phone (6 R.R. at 38).

Lela Thomas and her two children were also at the residence that day (6 R.R. at 64). Thomas testified that she was upstairs in the tub when the police came (6 R.R. at 62). When she heard them knocking, she got out of the tub, looked downstairs to see what was happening, and told the Appellant, who was upstairs with her at the time, that the police were there (6 R.R. at 63).

After the Appellant had gone downstairs and been taken into custody by the police, Thomas was standing outside with her children when the police approached and asked her "where's his stuff at?" (6 R.R. at 64). She led them upstairs and pointed out the Appellant's belongings (6 R.R. at 65). According to Thomas, the officer then

specifically asked her where the Appellant's phone was (6 R.R. at 65). When Ms. Thomas stated that she did not know where his phone was, the officer looked around and discovered a phone next to the bed on the floor (6 R.R. 65-66). The officer picked up the phone and asked if it was the Appellant's, to which Ms. Thomas responded that it was (6 R.R. at 66). The officer took the phone.

The State did not provide any witnesses to refute Ms. Thomas's version of events. Notably, the State did not provide any testimony from the officer (whose identity was not even revealed at the hearing) who actually seized the phone as to whether he seized the phone because he had probable cause to believe that it contained incriminating information. In any case, the trial court apparently believed Lela Thomas, stating (prior to making its ruling):

> "The testimony from (Thomas). She came off as a credible witness to me. I cannot see why she might be lying about something. She didn't come across that way to me. She said the officers said, where's his phone, and she pointed it out and said, there it is. Which I don't have a problem with, other than the fact, do you guys have a right to take his phone at that point? Especially if it's a non-issue, according to you. Why would they have a right to pick up the phone?" (6 R.R. at 109).

The Appellant testified at the suppression hearing. He claimed that once in the squad car, he did ask the officers to bring him a shirt and shoes to wear, which were contained in a clothing bag in an upstairs room of the apartment. (6 R.R. at 76-77). However, he specifically denied asking for his cell phone, which was not inside the clothing bag (6 R.R. at 76-77, 78). He also asked one of the officers, Sergeant Garza,

- 24 -

to call his father and inform him of the arrest, which the officer did on his own cell phone. (6 R.R. at 77-78). Sergeant Garza and the Appellant then left the scene for the station. (6 R.R. at 78).

The Appellant claimed that the first time he saw his phone after being arrested was later, when he was inside the interview room at the homicide division (6 R.R. at 78). He stated that he had not intended that his phone be taken (6 R.R. 77-78).

As was the case with Lela Thomas's version of what happened upstairs with the seizure of the cell phone, the State did not provide Sergeant Garza or any other officers to provide a different version of events. The Appellant's account was unrefuted.

In denying the motion to suppress, the trial court found that the Appellant had not asked the officer to retrieve his phone:

> "Mr. Uvukansi was at a location other than where he resided. He asked the officer, as best I can tell, recovered at least his clothes and shoes. There was no mention of any phone. So I won't use that as any indication that he told the officer to recover his phone, but when they went to get his property and his cell phone was pointed out by one of the occupants of the home. At that particular point in time I think they were authorized to pick up the phone so that nobody can take the phone and do something with it, but before they could capture anything off the phone then they would be required to get a warrant, which apparently they did. So far as recovery of the phone, motion to suppress will be overruled in that regard.
> That's it. Just give me one more thing to argue about. I do think they had a right to pick up the phone under the circumstances and not leave it there for fear that somebody could take the phone and obliterate what might be on the phone but they had no right to go into the phone until they got a warrant and they did." (7 R.R. at 6-7).

As far as the officers having any "fear that somebody could take the phone and obliterate what might be on the phone," the possibility that the phone might contain evidence which could be destroyed was never mentioned by any witness at the hearing, and certainly was not posited by anyone at the hearing as a reason for seizing the phone. No one testified that they thought that the cell phone might contain incriminating evidence.

## B. General Standards of Review

An appellate court reviews a trial court's denial of a motion to suppress under a bifurcated standard of review. *Valtierra v. State,* 310 S.W.3d 442, 447-48 (Tex. Crim. App. 2010). The trial court's factual findings are reviewed for an abuse of discretion, and the trial court's application of law to the facts is reviewed *de novo. Id.* When the trial court does not issue findings of fact, findings that support the trial court's ruling are implied if the evidence, viewed in a light most favorable to the ruling, supports those findings. *See State v. Kelly,* 204 S.W.3d 808, 818–19 (Tex. Crim. App. 2006). Almost total deference is given to the trial court's implied findings, especially those based on an evaluation of witness credibility and demeanor. *Valtierra,* 310 S.W.3d at 447. An appellate court should sustain the trial court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case. *Id.*

In cases involving a warrantless seizure of evidence, the federal constitution requires the State to meet its burden to prove an exception to the search warrant

requirement by a preponderance of the evidence, while the Texas Constitution requires the State to present clear and convincing evidence. *See Maxwell v. State,* 73 S.W.3d 278, 281 (Tex. Crim. App. 2002)(consent exception).

## C. Issues presented regarding seizure of Appellant's cell phone

The following issues are raised surrounding the taking of the cell phone:

1) Did the unnamed officer have legal authority to enter the apartment of Lela Thomas after the Appellant had been arrested and placed in the police squad car? Specifically, was the entry justified by the need to do a protective sweep of the premises or pursuant to voluntary consent from Lela Thomas?

2) Even assuming, *arguendo*, that the officer's entry into the apartment was legal, were the police authorized to seize the Appellant's cell phone? Specifically, was seizure of the cell phone justified under the plain view doctrine, *i.e.*, that it was immediately apparent that the cell phone might contain incriminating evidence? Alternatively, were the police authorized to seize the cell phone as being incident to the Appellant's arrest, as part of some caretaking or inventory authority, or because the phone had been abandoned by the Appellant?

3) Even assuming that the seizure of the phone was illegal, did the fact that the officers subsequently obtained a warrant to view the phone's contents cure the initial illegal seizure? That is, does the independent source doctrine act to allow the contents of the Appellant's cell phone into evidence on the basis that there was no causal

connection between the initial warrantless seizure of the phone and the procurement of the phone's contents? Finally, does the attenuation doctrine allow evidence of the cell phone's contents into evidence?

**1. Did the officer have a right to enter the apartment of Lela Thomas and Camelia James?**

The first question is whether the officers even had the right to enter the apartment. According to Sergeant Ponder, who was the only officer involved in the arrest to testify at the suppression hearing, he knocked on the apartment door and a woman who was later identified as Camelia James opened it (6 R.R. at 24, 41).[3] As Ponder was showing James a photo of the Appellant, the Appellant called from upstairs, "Hey, I'm coming down." (6 R.R. at 25). Ponder was at the doorway or just inside the apartment at this point (6 R.R. at 26). Without incident, the Appellant came downstairs, where he was frisked, handcuffed and put in a police car (6 R.R. at 28). Ponder did not conduct a search of the apartment or order anyone else to (6 R.R. at 29). He did not know which police officer went upstairs.

**Was entry justified in order to do a "protective sweep?"** Ponder noted that it was "standard procedure" when executing an arrest warrant to "clear the house to make sure when we're out in the car filling out the paperwork nobody comes out and shoots us or anything" (6 R.R. at 29). Ponder testified that as a general proposition, they sometimes entered a residence after an arrest warrant had been executed (6 R.R.

---

2 Camelia James and Lela Thomas were roommates (6 R.R. at 41).

at 33), but he testified that he did not know whether officers did such a sweep in this instance or if the people inside the house voluntarily exited the apartment (6 R.R. at 29-30). Thus, although he posited this rationale for entering the apartment as a possibility, it remains in the realm of speculation: Ponder had no idea whether that was the reason for entering the apartment or even if any officers did so.

One exception to the necessity of a search warrant is such a "protective sweep" performed by police officers. *Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 1094–95 (1990). A "protective sweep" is a "quick and limited search of the premises, incident to an arrest and conducted to protect the safety of the police officers or others." *Id.* "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.* Incident to arrest, police officers may lawfully, "as a precautionary matter and without probable cause or suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334, 110 S.Ct. at 1098.

A protective sweep of the premises cannot justify entry into the apartment in this case, given the fact that the Appellant was immediately arrested downstairs and placed in the squad car, and no evidence was adduced at the hearing that an officer on the scene had an objective, reasonable, and articulable suspicion that there were persons inside the apartment who posed a danger to them. *See Reasor v. State*, 988 S.W.2d 877, 882 (Tex. App.-San Antonio 1999), rev'd on other grounds, 12 S.W.3d

813 (Tex. Crim. App. 2000)(officer failed to articulate any facts justifying sweep). According to Sergeant Ponder, eight armed officers were on the scene (6 R.R. at 22). As far as persons at the apartment posing a danger to the officers, Ponder admitted that the woman who answered the door was not even frisked for weapons (6 R.R. at 30). *See also, Davis v. State*, 74 S.W.3d 90 (Tex. App.-Waco 2002, no pet.)(where defendant emerged from the kitchen saying, "just take my f_ing ass to jail," no protective sweep was justified, where officers voiced no objective, reasonable, and articulable suspicion that there were persons inside the residence who posed a danger to them, and an armed officer was watching the other persons present).

**Were officers given voluntary consent to enter the apartment?** Consent to search is another well-established exception to the constitutional requirements of both a warrant and probable cause. *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 2043–44, 36 L.Ed.2d 854 (1973); *State v. Ibarra,* 953 S.W.2d 242, 243 (Tex. Crim. App. 1997). "The Fourth Amendment test for a valid consent to search is that the consent be voluntary, and '[v]oluntariness is a question of fact to be determined from all the circumstances.'" *Ohio v. Robinette,* 519 U.S. 33, 40, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (quoting *Schneckloth,* 412 U.S. at 248-49, 93 S.Ct. at 2059). In order to be valid, the consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048; *see also Allridge v. State,* 850 S.W.2d 471, 493 (Tex. Crim. App. 1991)("The consent must be

shown to be positive and unequivocal, and there must not be any duress or coercion") (citation omitted). By the same token, consent is not established by "showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)(where officer falsely represented he had a valid search warrant, consent not voluntary).

Sergeant Ponder did not recall whether anyone asked permission to search the apartment (6 R.R. at 34). The officer who seized the cell phone was never identified and did not testify, so nothing was established at the hearing as to whether he obtained consent to enter the apartment from Lela Thomas. However, Thomas did testify. Regarding the officer's entry into the apartment after the Appellant had already been placed in the squad car, Thomas testified that she was standing outside with her children when the police approached her, asking "where's his stuff at?" (6 R.R. at 64). She led them upstairs, pointed out the Appellant's clothes, and then, upon specifically being asked if a phone lying nearby belonged to the Appellant, replied that it did (6 R.R. at 64-66).

This does not constitute a voluntary consent to search the apartment. It is instead mere acquiescence to a claim of lawful authority. In *Roth v. State*, 917 S.W.2d 292 (Tex. App.-Austin 1995, no pet.), police officers knocked on the front door of an apartment. Roth answered and opened the door just enough to look outside. One of the officers asked Roth if another person, a juvenile runaway, was inside. Roth replied

"he's upstairs" and stepped away from the door. The police followed him upstairs, where he led them to their suspect. Roth then admitted that drugs lying in plain view inside the apartment belonged to him. Both the police officer and Roth agreed at the suppression hearing that there was no request to enter the apartment or to search, nor was there an invitation to enter. *Id.*, at 300. Likewise, in the instant case, the only account of how the officers entered the apartment came from Lela Thomas, who testified that she led the police upstairs after they approached her, asking "where's his stuff at?" (6 R.R. at 64). Holding that the consent to enter the apartment had not been shown to have been freely and voluntarily given under the circumstances in *Roth*, the Austin Court of Appeals reversed the trial court's denial of Roth's motion to suppress. *Id.* at 300. Likewise, the State failed to prove that Lela Thomas's consent, if any can be said to have been given, was voluntary in this case, rather than being a mere acquiescence to the officer's apparent authority to go upstairs.

This case is also very similar to *Giles v. State*, No. 13-06-00570-CR, 2007 WL 2390823 (Tex. App.-Corpus Christi-Edinburg August 23, 2007, no pet.)(mem. op., not designated for publication).[4] In *Giles*, a witness called police to report a suspected drunken driver. The driver had apparently driven home and gone inside her house. Police arrived to find the suspect's boyfriend outside the house. They told the

---

[4] Although *Giles* is an unpublished opinion and so does not have precedential value, the reasoning of the Corpus Christi Court of Appeals is instructive in this case, as the facts are very similar to those presented here.

boyfriend that they were conducting a criminal investigation and that they wanted to speak to his girlfriend. The boyfriend walked inside with the two police officers following him. The officers did not ask for permission to enter the home. The Corpus Christi Court of Appeals held that "under these facts, we conclude that the trial court erred in finding that consent had been given to enter the residence," reasoning that the boyfriend's action constituted "mere acquiescence to the officers' entry into the residence." *Id.*, at * 5.

**2) Even if the officer's entry into the apartment had been legal, were the police authorized to seize the Appellant's cell phone?**

**Were the police authorized to seize the cell phone under the "plain view" doctrine?** The "plain view" doctrine is an exception to the warrant requirement. *See Keehn v. State,* 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). It allows an officer to seize an item during a warrantless search if: (1) the officer sees an item in plain view at a vantage point where he has the right to be; and (2) it is immediately apparent that the item seized constitutes evidence, that is, that there is probable cause to associate the item with criminal activity. *Miller v. State,* 393 S.W.3d 255, 266 (Tex. Crim. App. 2012); *State v. Dobbs,* 323 S.W.3d 184, 185 (Tex. Crim. App. 2010)("so long as probable cause to believe that items found in plain view constitute contraband arises while police are still lawfully on the premises…the seizure of those items is permissible under the Fourth Amendment.").

In a recent case which also involved a warrantless seizure of a cell phone that relied on the plain view exception, this Court explained the distinction between the rules governing an illegal search and those surrounding an illegal seizure. *Cruse v. State*, No. 01-13-00077-CR, 2014 WL 3607250 (Tex. App.-Houston [1ˢᵗ Dist.] July 22, 2014, pet. ref'd)(mem. op., not designated for publication).[5] In *Cruse*, the victim of a gang rape told police that several of her assailants had videotaped the assaults on their cell phones. Cruse was one of the suspects. As a result, a police officer seized Cruse's cell phone. Police subsequently obtained a search warrant to view the phone's contents, which revealed a video of Cruse sexually assaulting the victim. Cruse filed a motion to suppress the video from the cell phone, complaining that it had been seized without a warrant.

In upholding the warrantless seizure of the cell phone, this Court first pointed out the distinction between illegal searches and illegal seizures:

> The prohibition on unreasonable seizures is distinct from the prohibition on unreasonable searches. *See United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *Id.* "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *Cruse*, at *2.

---

[5] Although *Cruse* is an unpublished opinion and so is not binding precedent, this Court's reasoning in *Cruse* is appropriate in this case, as the facts are very similar to those presented here.

- 34 -

The Court then invoked the plain view seizure doctrine as the rationale for seizing the phone in *Cruse*, since in light of what the officer knew at the time, there was probable cause to believe the phone contained incriminating evidence:

> [I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 2136-37, 124 L.Ed.2d 334 (1993). An object's incriminating character is considered immediately apparent if an officer has probable cause to believe it contains contraband. *See Arizona v. Hicks,* 480 U.S. 321, 326-27, 107 S.Ct. 1149, 1153–54, 94 L.Ed.2d 347 (1987); *Jacobsen,* 466 U.S. at 121–22, 104 S.Ct. at 1661; *State v. Dobbs,* 323 S.W.3d 184, 189 (Tex. Crim. App. 2010). *Cruse*, at *2, 3.

The "plain view" doctrine does not apply to this case because no one testified in this case that when it was seized, there was probable cause to believe that Appellant's cell phone contained incriminating evidence. This is the critical distinction between the instant case and the facts in *Cruse*, where that cell phone was thought to contain a videotape of the suspect's criminal act. In the instant case, Sergeant Ponder testified that the police weren't looking for evidence, but simply went to the location to arrest the Appellant (6 R.R. at 20). During questioning by defense counsel, Ponder denied that it would have been apparent that the cell phone contained incriminating evidence:

> Defense counsel: You testified you were not there to look for a phone?
> Ponder: Correct.

Q.: Is it fair to say if you saw a phone lying there you wouldn't induce immediately that there was anything incriminating about a phone, would you?

A.: Correct.

Q.: You wouldn't see a phone lying there and immediately have a belief that it was (inaudible) crime?

A.: Correct.

Q.: And then no one had instructed you to get the phone, if you saw one?

A.: Correct.

Q.: So you, personally, at the time you arrested him, had you been told by Officer Cegielski that there would be incriminating evidence on the phone?

A.: No, he never told me that.

Q.: To your knowledge, was anybody else in your unit informed of that?

A.: No.

Q.: As far as you were concerned, his phone was of no importance whatsoever to this case?

A.: Correct. Not that I was aware of. (6 R.R. at 39-40).

The lead investigator in the case, Sergeant Cegielski, was not present when the cell phone was seized, but as the following exchange from the suppression hearing makes clear, he also did not believe that the Appellant's cell phone contained incriminating evidence:

Defense counsel:   All right. So the State questioned you, you never discussed with the arrest team the importance or unimportance of the phone, right?

Cegielski: No, sir.

Q.: All right. On July 3rd, you had no reason to believe that there would be any incriminating evidence on his phone, did you?

A.: I didn't consider the cell phone in any way at that time (6 R.R. at 89).

Because there was no testimony at the suppression hearing that it was immediately apparent to the officer that the cell phone contained incriminating evidence, the "plain view" doctrine cannot be relied upon by the State to justify the seizure.

**3) Was seizure of the cell phone justified as being a legal seizure made incident to the Appellant's arrest?**

A search incident to arrest is limited to the arrestee's person and the area within his immediate control, which is to say "the area into which an arrestee might reach in order to grab a weapon or evidentiary items." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040 (1969). As explained *supra*, no theory was posited at the suppression hearing, nor can one be conjured, where it could be seriously argued that the Appellant's cell phone, lying on the floor in an upstairs bedroom, could pose a danger to officers after the Appellant was in custody in a police car outside.

With respect to what police may do incident to an arrest, in terms of **inventorying and safeguarding** an arrestee's belongings that are inside private premises, rather than in an automobile, the Court of Criminal Appeals addressed this issue in *Moberg v. State,* 810 S.W.2d 190 (Tex. Crim. App. 1991). Moberg was arrested at a motel room pursuant to a valid arrest warrant involving the aggravated sexual assault of his teenage daughter. After Moberg had already been taken to the police station, police returned to the motel room, were allowed entry by the manager, and

removed Moberg's suitcase, an ice chest, a laundry basket, and clothing. In the laundry basket, the police found incriminating photographs of Moberg having sex with underage girls. *Id.,* at 192.

The Court of Criminal Appeals pointed out that "the doctrine of inventory search is usually applicable when authorities have legitimately come into possession of belongings or containers of the arrestee and they must inventory the contents of the property initially taken into custody." *Id.,* at 194. In determining that Moberg enjoyed a reasonable expectation of privacy in his motel room, the Court noted, in words that apply equally to the instant case: "Appellant had brought his personal belongings into the room and treated the room as if it was a place where he intended to repose for the evening. In fact when the police entered the room pursuant to the arrest warrant, appellant was on the bed in his underwear. Certainly appellant was treating the room as a place where a traveler could obtain privacy away from all interlopers." *Id.,* at 192. The Court reversed Moberg's conviction due to the unlawful seizure of his belongings.

The State bears the burden of establishing that the police conducted a lawful inventory search. *Moskey v. State*, 333 S.W.3d 696, 700 (Tex. App.-Houston [1st Dist.] 2010, no pet.). The State satisfies this burden by demonstrating that (1) an inventory policy exists and (2) the officers followed the policy. *Id.*

As with various other matters issues that were relevant to the Appellant's motion to suppress (consent, plain view, independent source, attenuation), the State provided no evidence that its seizure of the Appellant's cell phone was done pursuant to any inventory policy, or even that the phone was seized because it was with the Appellant's clothing. Lela Thomas refuted that possibility and the trial court believed her. The State chose to provide no evidence of any inventory policy at the hearing, nor did they give any explanation for why the police felt authorized to seize the phone, just as the State inexplicably did not present the police officer who seized the phone (or even his name), or the affidavit, contents or time of issuance of the subsequent search warrant. The seizure of the Appellant's cell phone cannot be justified as an inventory search in the absence of any testimony by the State that it was seized for that reason.

**Did the Appellant abandon his cell phone?** There is no evidence that the Appellant abandoned his cell phone. No seizure occurs under the Fourth Amendment if police take possession of property that has been abandoned. *Comer v. State*, 754 S.W.2d 656, 659 (Tex. Crim. App. 1986). However, abandonment requires proof that: (1) the individual intended to abandon the property; and (2) that he freely decided to abandon the property. *Id.* Intent to abandon property is typically "inferred from words spoken, acts done, and other objective facts and relevant circumstances." *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997). There is nothing to

suggest that the Appellant intended to abandon his cell phone in this case. The Appellant was faced with a situation where 6-8 armed policemen had come to the door with a warrant for his arrest. He surrendered quickly, not even taking time to dress himself. Under these circumstances, it cannot be said that he intended to abandon his phone any more than he intended to abandon his clothing. His obvious intent under the situation was to quickly surrender to avoid any conflict with the police downstairs.

### 4.  "Independent source" and "attenuation of taint"

Under the **"independent source"** doctrine, the exclusionary rule does not exclude evidence which is lawfully obtained through means that are independent of the initial illegality. The Court of Criminal Appeals held in *Wehrenberg v. State*, 416 S.W.3d 458, 465 (Tex. Crim. App. 2013), that evidence obtained pursuant to an independent source is not obtained in violation of the law and so is not subject to suppression under Article 38.23. Rather, evidence is obtained in violation of the law only if there is some causal connection between the illegal conduct and the acquisition of evidence.

In *Wehrenberg*, the Court cited the rule announced in *Segura v. United States*, 468 U.S. 796 (1984), that "notwithstanding a prior instance of unlawful police conduct, evidence actually discovered and obtained pursuant to a valid search warrant is not subject to suppression, so long as the police would have sought the warrant regardless

- 40 -

of any observations made during the illegal entry." *Id.*, at 465-466. In *Segura*, the warrant that police obtained after an initial illegal entry into the defendant's apartment "was issued wholly on information known to the officers before the entry into the apartment," and "none of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment." *Segura*, 468 U.S. at 814.

In *Davila v. State*, 441 S.W.3d 751 (Tex. App.-Houston [1st Dist.] 2014, pet. ref'd), this Court concluded that an initial warrantless sweep of Davila's home by police was illegal. *Id.*, at 758. However, citing *Wehrenberg*, this Court also found that none of the information that was utilized to obtain the subsequent warrant to search Davila's house came from the prior, unlawful sweep, but was instead from an independent source. *Id.*, at 760. Concluding that "[B]ecause the affidavit (in support of the search warrant) contained sufficient allegations that were independent of any tainted information, we conclude that the affidavit established a 'fair probability' that cocaine would likely be found upon searching Davila's home." *Id.*, at 761.

The independent source doctrine does not apply in the instant case because there is an obvious causal connection between the initial illegal seizure of the Appellant's cell phone and the officers' subsequent acquisition of its contents. Unlike the facts in *Wehrenberg*, *Segura* or *Davila*, at the time of the initial illegal seizure of the Appellant's phone, the police did not have any basis for believing that the phone

contained incriminating evidence. The State made no attempt at the suppression hearing to establish any independent source that justified the later search warrant for the contents of the Appellant's cell phone. Neither the search warrant nor its underlying affidavit was produced at the hearing, nor did the officers who testified suggest that they had other information that constituted an independent source. For example, if Sergeant Cegielski had testified that prior to the initial seizure of the Appellant's cell phone, police already had probable cause to believe that the phone contained incriminating photos, then that may have constituted an independent source that would have broken the link between the initial illegality of seizing the phone and the later seizure of the photos from the phone.

To the contrary, Cegielski admitted at the hearing that the cell phone first became relevant only after he discovered the officers had brought it with them from the residence (6 R.R. at 86). There was an obvious causal connection between the procurement of the information *via* the subsequent warrant and the initial seizure of the phone. No information whatsoever was produced at the suppression hearing which suggested that the search warrant was based on independent information.

Under the **"attenuation doctrine"** only evidence sufficiently attenuated from illegal police conduct can be admitted under Article 38.23. *Johnson v. State*, 871 S.W.2d 744, 750-751 (Tex. Crim. App. 1994); *Sims v. State,* 84 S.W.3d 805, 810 (Tex. App.-Houston [1st Dist.] 2002, no pet.). The question in this case thus becomes whether

the subsequent warrant to search the Appellant's cell phone was sufficiently purged of the primary taint of the illegal seizure of the cell phone.

It is the State's burden to prove attenuation:

> In summary, then: A defendant has the burden of showing that challenged evidence was obtained as a factual result of the violation of law that he establishes. Once this is done, the State has—or should have—the burden of persuading the trial court that the causal connection between the violation and the State's acquisition of the evidence is such that the taint was attenuated and the evidence therefore was not obtained in violation of the provision of law.

George E. Dix & John M. Schmolesky, 41 Texas Practice: Criminal Practice and Procedure § 18:29 (3rd ed. 2011); *Monge v. State,* 276 S.W.3d 180, 184-85 (Tex. App.-Houston [14th Dist.] 2009, no pet.).

In *Mazuca v. State*, 375 S.W.3d 294 (Tex. Crim. App. 2013), which dealt with the specific issue of whether the discovery of an outstanding arrest warrant on a driver was an intervening circumstance that attenuated the taint of an traffic illegal stop, the Court of Criminal Appeals cited three factors as appropriate considerations in determining whether the discovery of physical evidence is sufficiently attenuated from an illegal violation by the police: (1) the temporal proximity of the illegal conduct and the seizure of incriminating evidence; (2) the presence of intervening circumstances; and (3) the purposefulness or flagrancy of the police misconduct. *Id.*, at 301-307. The Court concluded that "[w]hen police find and seize physical evidence shortly after an illegal stop, in the absence of the discovery of an outstanding arrest warrant in

between, that physical evidence should ordinarily be suppressed, even if the police misconduct is not highly purposeful or flagrantly abusive of Fourth Amendment rights." *Id.* at 306. Although the Court had before it in *Mazuca* the common situation of an illegal traffic stop followed by the discovery of an outstanding warrant on the driver, it did not limit its discussion to those scenarios.

In any event, the State did not meet its burden in the instant case. The officer who seized the phone did not testify at the suppression hearing, so there is nothing to refute Lela Thomas's testimony that the officer was looking for the Appellant's phone when he went upstairs. As to the temporal proximity of the initial illegal seizure of the cell phone and the subsequent search warrant, it is anyone's guess. The State did not produce either the search warrant for the contents of the phone or the underlying affidavit. As for the presence of intervening circumstances which may have attenuated the taint, the record is silent. The State did not meet its burden.

In summary, after the Appellant met his burden of establishing that his cell phone was seized without a search warrant, it was the State's burden to demonstrate that an exception to the warrant requirement existed. The State failed to provide any testimony that justifies the warrantless seizure in this case and the trial court abused its discretion in holding that there was a valid legal exception to the warrant requirement.

**D. The erroneous denial of Appellant's motion to suppress evidence resulted in constitutional error that resulted in harm to the Appellant**

"[T]he harm resulting from a trial court's erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment [of the United States Constitution]" is reviewed under Texas Rule of Appellate Procedure 44.2(a)'s constitutional standard. *Hernandez v. State*, 60 S.W.3d 106, 107-108 (Tex. Crim. App. 2001)(constitutional error standard applies to admission of evidence obtained pursuant to an illegal search).

Rule of Appellate Procedure 44.2(a) states:

> If the appellate record in a criminal case reveals constitutional error that is subject to harmless error review, the court of appeals **must reverse** a judgment of conviction or punishment unless the court determines **beyond a reasonable doubt** that the error did not contribute to the conviction or punishment. (Emphasis added).

If the record as a whole supports even a "reasonable possibility" that the erroneously admitted evidence contributed to the jury's verdict, the judgment must be reversed regardless of whether independent evidence is otherwise sufficient to sustain the jury's verdict of guilt. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

The seizure of the Appellant's cell phone led to the photographs on the phone being introduced into evidence. State's exhibit 55 and 56 were photographs taken within an hour or so after the shooting (8 R.R. at 233). The photographs depicted, among others, Dexter Brown, Devonte Bennett, and Deveon Griffin (8 R.R. at 233-

234, 237). The harm that flowed from the acquisition of the contents of the phone included the following:

1. At the end of her opening statement, the prosecutor told the jury that she would present evidence of the "big break" that occurred in the investigation of the case (7 R.R. at 19), namely, the fact that Devonte Bennett, a friend of the Appellant, had told police that he was with the Appellant the night of the shooting and that he saw the Appellant shooting into the crowd (7 R.R. at 19). This testimony would obviously be very important because without Bennett, the State's case relied upon a sole eyewitness, Oscar Jeresano.

When he was called by the State as a witness, Bennett ultimately refused to answer the prosecutor's questions, but not before he did initially verify that he was one of the persons pictured in the cell phone photograph (State's exhibit 56) from the Appellant's phone (7 R.R. at 131-136, 139). He was later held in contempt of court for refusing to testify, and was ordered to serve 180 days in jail (8 R.R. at 133-134).

In the absence of the photographs downloaded from the Appellant's phone, the prosecutor's assertion in her opening statement that Devonte Bennett was with the Appellant the night of the shooting and saw him shoot into the crowd would have remained just that…an assertion. However, the photographs which comprised State's exhibits 55 and 56 established that Bennett was indeed with the Appellant, only an

hour after the shooting, and so lent some credence to the prosecutor's assertion during her opening statement.

2.    Dexter Brown was also pictured in the cell phone photographs. During his testimony, Sergeant Cegielski recounted that Oscar Jeresano had identified Dexter Brown from a photo spread as someone he saw at the nightclub the night of the shooting (8 R.R. at 207-208). Cegielski testified that he believed that Dexter Brown was one of the shooters (8 R.R. at 207). As was the case with Devonte Bennett, photos showing the Appellant with one of the suspected shooters, just an hour after the shooting, coupled with Cegielski's suspicions of Brown's involvement in the murders, would certainly have increased the likelihood of the Appellant's involvement in the minds of the jury.

3.    Cegielski also used the cell phone photos to conclude that the Appellant lied to the police about what he was wearing the night of the shooting (8 R.R. at 237-238). Oscar Jeresano said the shooter was wearing a long-sleeved dark shirt. The prosecutor argued in his closing that the Appellant had initially told police that he was wearing something similar, but in the cell phone photos, he was wearing a white shirt and red shorts (10 R.R. at 12). Thus, the Appellant's cell phone photos were used to impeach the Appellant's statement to the police, and by the prosecutor in his closing argument as evidence that the Appellant "lied about what he was wearing" (10 R.R. at 12).

In short, the photos from the Appellant's cell phone provided the State with evidence which linked the Appellant…only an hour after the shooting…to other persons the police considered suspects and also cast doubt on the Appellant's credibility in the story he initially gave to police. Because there is clearly a "reasonable possibility" that the erroneously admitted evidence from the cell phone contributed to the jury's verdict, the judgment must be reversed regardless of whether independent evidence is otherwise sufficient to sustain the jury's verdict of guilt. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998).

## Issue Four

**The trial court erred in overruling defense counsel's objection to the prosecutor's closing argument, which interjected new and harmful facts into the proceedings through unsworn jury argument, namely, that a witness who had not testified at trial had given the Appellant's name as someone involved in the shooting.**

## Argument

### A.    Statement of Facts

Prior to trial, defense counsel filed a motion in limine, in which she asked that the State approach the bench before eliciting certain evidence. Among other evidence that was the subject of the motion was the following:

  "1.  Any reference, either directly or indirectly, whether in opening statement, argument, jury selection, or otherwise, to the statements against my Client Uvukansi's interest by Dedrick Foster, who is now deceased in violation of the Confrontation Clause. Defense counsel never had the opportunity to cross examine Dedrick Foster about these statements" (C.R. at 1035-1038).

At a brief hearing regarding the motion in limine, which took place prior to the beginning of testimony, the trial court asked the prosecutor: "Regarding Number 1, do you have any problems?" to which the prosecutor replied she did not (7 R.R. at 8).

In her opening statement, the prosecutor, recounting the difficulty police initially had in developing leads in the case, told the jury: "A man comes forward and says he has information, and based on that information the defendant is developed as a suspect. Now that man that came forward, Dedrick Foster, you won't hear from him. He was killed two weeks after talking to the police." (7 R.R. at 17). The prosecutor did not say…because it would have been a clear violation of the motion in limine…that Foster had named the Appellant as being involved in the killings. From the prosecutor's statement, the jury was left with the bare information that Foster had some information from which the police were able to develop the Appellant as a suspect. It could simply have been that he had identified a photograph of the Appellant, or that he confirmed that the Appellant was a member of the Bloods, or provided some other type of preliminary information from which the police were able to investigate their case further. But her remarks in her opening statement stayed within the boundaries of what was appropriate, by not communicating to the jury that Foster had actually told the police that the Appellant was involved in the shootings.

At trial, the lead investigator in the case, Officer Cegielski, was testifying regarding the fact that his investigation into the killings was initially unsuccessful, when the following transpired:

> "PROSECUTOR: Did you meet with Dedrick Foster?
> CEGIELSKI: Yes, ma'am.
> Q.: And during your interview with him, did the name…"

At this point, defense counsel asked to approach the bench, apparently concerned that the prosecutor might elicit what Foster, now deceased, had said to Cegielski, in violation of the motion in limine and the agreement by the prosecutor that she would not introduce anything Foster had told police. The prosecutor assured defense counsel and the trial court that "I am not going to get him to say anything that this witness said. I'm going to ask him some information about what he did, not asking for what the response was from that witness." (8 R.R. at 197).

Then in closing argument, despite having told the jury that they would not be hearing from Foster, and after reassuring the court and defense counsel that she had no intention to elicit anything Foster had said to police, the prosecutor accomplished through unsworn jury argument what she could not have gotten into evidence, and which she had vowed not to discuss:

> "But then they (the police) got a break. Dedrick Foster came forward and *he gave this defendant's name as someone involved in the shooting.*" (10 R.R. at 31)(emphasis added).

No evidence had been adduced that Foster had told the police that the Appellant was "involved in the shooting." Defense counsel objected that the prosecutor was arguing "outside the record" that "there's no evidence of that in the record." The trial court overruled the objection (10 R.R. at 31). Thus, although obviously quite aware that it would be improper to elicit through Officer Cegielski what a dead man had said previously, and having reassured the trial court twice that she would not do so, the prosecutor improperly conveyed to the jury what Foster had said to the police during her argument, by telling them that "he gave this defendant's name as someone involved in the shooting." It is important to remember that the defense in this case rested primarily on the fact that there was only one eyewitness who had testified that the Appellant was the shooter, and had argued that his testimony was not credible. The effect of the prosecutor's improper jury argument was to inform the jury, through her unsworn jury argument, that there was another witness who told the police that the Appellant was involved in the murders, a witness that the defense had no opportunity to investigate or cross-examine. [6]

## B.    Error and harm analysis

The most fundamental rule of closing argument is that counsel must confine their arguments to the evidence that was introduced during

---

[6] This was not the only time in the trial that the prosecutor informed the jury, through her own unsworn commentary, that a witness who did not testify had told police that the Appellant was the shooter. During her opening statement, the prosecutor told the jury that Devonte Bennett saw the Appellant "shooting those people" (7 R.R. at 19). Bennett refused to testify (7 R.R. at 131-146). Thus, through her opening statement and her closing argument, the prosecutor effectively informed the jury of two people who linked the Appellant to the murder…without eliciting a word of testimony from either witness.

the trial and to reasonable deductions from that evidence. Counsel may not argue outside that record and ask the jury to speculate as to what evidence might have been introduced. It would be of little benefit to have an elaborate set of rules defining what evidence can and cannot be introduced during trial if counsel could ignore those rules and interject new matters by statements during closing argument. Evidence must be received from the witness stand, not from the mouths of counsel.

George E. Dix & John M. Schmolesky, 43 Texas Practice: Criminal Practice and Procedure § 45:9 (3rd ed. 2011). The law requires, and presumes, a fair trial, free from improper argument by the State. *Acosta v. State*, 411 S.W.3d 76, 92-93 (Tex. App.-Houston [1st Dist.] 2013, no pet.).

The suggestion that Dedrick Foster "gave this defendant's name as someone involved in the shooting" was never raised in the trial, was not a reasonable deduction from the evidence, and was not an answer to any argument of opposing counsel.

To complain of improper jury argument on appeal, a defendant must generally have objected to the argument and pursue the objection to an adverse ruling. *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). Such was done in this case when defense counsel objected that the prosecutor was arguing "outside the record" and that "there's no evidence of that in the record." The trial court overruled the objection (10 R.R. at 31). Therefore, the objection was met with an adverse ruling and the issue is preserved.

Although it is an area of special concern, argument inviting speculation on evidence outside the record does not constitute constitutional error. Rather, the error is judged under the standard applicable to

> nonconstitutional error, whether the error had a substantial and injurious effect or influence in determining the jury's verdict.
>
> In determining if the error is harmless, it is important whether the trial court overruled the trial objection or sustained it. If the trial court overruled an objection to an improper argument, that has the effect, in the eyes of the jury, of the trial court approving of the argument and makes it more likely an appellate court will find the error reversible.

George E. Dix & John M. Schmolesky, 43 Texas Practice: Criminal Practice and Procedure § 45:10 (3rd ed. 2011).

The harm standard in Texas for nonconstitutional error in jury argument is taken from the federal standard:

> (1) the severity of the misconduct; (2) measures adopted to cure the misconduct; and (3) the certainty of conviction absent the misconduct.

*See United States v. Palmer*, 37 F.3d 1080, 1085 (5th Cir. 1994), cert. denied, 514 U.S. 1087 (1995); *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (applying federal test in determining that improper prosecution argument was harmless error).

As to the severity of the prosecutor's misconduct in arguing as she did, her argument came after two previous junctures in the trial where she indicated that she understood that any mention of what Dedrick Foster had told police about the Appellant's involvement in the murder was inadmissible and inappropriate: at the hearing held pursuant to the motion in limine, and as she questioned Officer Cegielski. The prosecutor cannot be said to have misunderstood the significance of her comments in this case, where the gravamen of the defense was that the only

eyewitness, Oscar Jeresano, was mistaken about his identification of the Appellant as a shooter. Telling the jury that Dedrick Foster had "gave this defendant's name as someone involved in the shooting" informed the jury, through the prosecutor's argument, that there was more than just eyewitness testimony. There was also an absent witness, whom the jury had also been informed had been killed, who linked the Appellant to the shooting. Not only did this bolster the testimony of the single eyewitness to the offense, but it also ran the extreme risk of the jury wondering why someone whom they now understood to have linked the Appellant to the shooting had been killed. Obviously, as defense counsel made clear, she had not been given any opportunity to cross-examine Foster.

As stated *supra*, no curative measures were taken by the trial court when the defense objected. To the contrary, the trial court overruled the objection, thereby indicating that the prosecutor's interjection of unproven facts was appropriate and that the jury was free to consider it.

Finally, with respect to the certainty of conviction absent the misconduct, it is impossible to say what effect the prosecutor's new information had on the jury, but it is reasonable to conclude that it was critical in a one-eyewitness case. The prosecutor's careful assurances at both the motion in limine hearing and during Cegielski's testimony, which revealed her understanding of how explosive any testimony would be concerning what Foster had told police, cannot be reconciled with any conclusion

that informing the jury of what he said for the first time at closing argument was insignificant since a conviction was certain anyway.

The prosecutor's reckless interjection of new and harmful facts through unsworn jury argument cannot be disregarded in this case because it affected the Appellant's substantial rights under Tex. R. App. P. 44.2(b), specifically, his right to a fair trial based upon evidence received from the witness stand, rather than from the prosecutor's mouth. As a result, the judgment of conviction should be reversed, and the case remanded for a new trial.

## PRAYER FOR RELIEF

Feanyichi Uvukansi prays that for the reasons stated, this Court reverse the judgment of conviction and remand this case for a new trial or in the alternative, reform the judgment to reflect a conviction for murder, and remand the case for a new punishment hearing.

Respectfully submitted,

Alexander Bunin
Chief Public Defender
Harris County Texas

/s/ Bob Wicoff
Bob Wicoff
Assistant Public Defender
Harris County Texas
1201 Franklin, 13th floor
Houston Texas 77002
(713) 274-6781
TBA No. 21422700

## CERTIFICATE OF SERVICE

A true copy of this brief has been served on the appellate division of the Harris County District Attorney's Office on the 9th of March, 2015, by emailing a copy through the efile.txcourts.gov system

/s/ Bob Wicoff
Bob Wicoff


## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the length requirements of Tex. R. App. P. 9.4(i). Specifically, the foregoing brief contains a total of **14,295** words, which is the total word count excluding those matters listed in Tex. R. App. P. 9.4(i)(1).

/s/ Bob Wicoff
Bob Wicoff